Christopher **EASON**, individually and as Surviving Spouse and as Administrator of the Estate of Susan Eason, Plaintiff

v.

**LINDEN AVIONICS, INC.,** Jen Rob Aviation, Inc., King Radio Corporation, Bendix Corporation, Allied–Signal, Inc. and Beech Aircraft Corporation, Defendants.

Civ. A. No. 87–4680.

United States District Court, D. New Jersey.

Jan. 12, 1989.

Noah H. Kushlefsky, Kreindler & Kreindler, New York City, for plaintiff.

Martin G. Picillo, Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, Short Hills, N.J., for Linden Avionics, Inc.

David N. Zeehandelaar, Bolger, Picker & Winer, Vorhees Township, N.J., for Jen Rob Aviation, Inc.

John T. Keale, Carpenter, Bennett & Morrissey, Newark, N.J., for King Radio Corp. and Allied–Signal, Inc.

Wayne D. Greenfeder, Schwartz and Andolino, Livingston, N.J., for Beech Aircraft Corp.

LECHNER, District Judge.

In this diversity action Christopher Eason, in his individual capacity and as administrator of the estate, sues to recover for the wrongful death of his wife Susan. Allan Ramsay and Susan Eason were killed when the small passenger plane they were piloting and co-piloting crashed in Rhode Island. Several defendants allegedly responsible for the design, manufacture, maintenance and ownership of the airplane are joined in this action.

Defendant Beech Aircraft Corporation ("Beech") moves to dismiss the claim against it for lack of personal jurisdiction and improper venue. In the alternative, Beech requests that the action be transferred to the United States District Court for the District of Kansas. Beech raised an identical jurisdiction motion in the Superior Court of New Jersey, Bergen County where a companion suit was brought by the Estate of Allan Ramsay and is presently pending (the "State Court Action"). The motion in the State Court Action was denied.

Presented in this motion are four issues: (1) whether the state court ruling denying Beech's jurisdictional motion has preclusive effect in this action; (2) if not, whether Beech has sufficient minimum contacts with the State of New Jersey to render it amenable to personal jurisdiction; (3) whether the District of New Jersey is the proper venue for the claim against Beech; and (4) whether this action should be transferred to the District of Kansas.

*Facts*

On November 27, 1985 pilot Allan Ramsay and co-pilot Susan Eason were killed when their Beechcraft King Air Model C–90 crashed in East Greenwich, Rhode Island while en route from Morristown, New Jersey to Providence, Rhode Island. Alleging responsibility on the part of various defendants, Christopher Eason ("Eason") brought this action based on theories of negligence and strict liability. The State Court Action seeks recovery for the wrongful death of pilot Allan Ramsay. *See* Letter from Noah H. Kushlefsky to chambers, dated October 6, 1988. The plaintiff in this

action and the plaintiff in the State Court Action are represented by the same law firm. *Id.*

Beech, a Delaware corporation with its principal place of business in Kansas, allegedly designed and manufactured the Beechcraft airplane. Defendant Jen Rob Aviation, Inc. ("Jen Rob"), a New Jersey corporation operating principally in New Jersey, allegedly owned the airplane at the time of the crash. Defendants King Radio Corporation ("King Radio"), a Kansas corporation, and Bendix Corporation ("Bendix"), a Delaware corporation, allegedly designed various component parts of the airplane. Defendant Linden Avionics, Inc. ("Linden"), a New Jersey corporation, allegedly maintained the airplane on behalf of Jen Rob. Defendant Allied–Signal, Inc. ("Allied–Signal"), having acquired King Radio and Bendix, is named in the action on a theory of corporate successor liability.

In its motion to dismiss, Beech contends its contacts with New Jersey are insufficient to support either jurisdiction or venue in this district. Beech conducts the bulk of its business outside of New Jersey. Although authorized to do business in Colorado and Alabama, Beech is not so authorized in New Jersey. Affidavit of Richard S. Griffiths ("Griffiths Aff.") ¶ 2. Beech maintains no manufacturing, sales, warehouse or other facilities in New Jersey. *Id.* at ¶ 4. Beech owns no property in New Jersey. *Id.* It has no officers or employees in New Jersey, nor has it authorized a New Jersey agent to receive service of process. *Id.* at ¶ 6.

The only Beech contacts with New Jersey arise from its use of the New Jersey market for the sale of its airplanes. Beech airplanes are sold by various New Jersey aviation centers. *Id.* at ¶ 7. Two wholesalers, one of which is located outside of New Jersey, supply Beech parts within New Jersey. *Id.* These companies operate as independent distributors. *Id.* According to Beech, "all sales of aircraft and parts by

Beech to these independent distributors are made pursuant to sales purposefully negotiated and completed in Kansas." [1] Beech Moving Brief at 4.

Beech concedes its employees often make trips to New Jersey. "On occasion, Beech employees have assisted independent distributors located within the State of New Jersey and demonstrated Beech products. Such assistance is performed solely at the request of and for the benefit of such independent distributors." Plaintiff's Exhibit 1 at 3, ¶ 8. Beech also admits to making contracts for "procurement of vendor goods or services [from] a New Jersey retailer." *Id.* Beech has sold thirty-one airplanes to New Jersey aviation centers within the last five years. *Id.* Attachment "A." Beech lists over one hundred employee trips to New Jersey in the past five years. *Id.* Attachment "B." Beech also admits to purchasing goods and services from companies located in New Jersey. Beech Moving Brief at 6.

With regard to the sale of the airplane flown by Allan Ramsay and Susan Eason, Beech first sold the plane to its subsidiary, Indiana Beechcraft Corporation, located in Indiana, which in turn sold the plane to a subsidiary, Beechcraft East, located in Farmingdale, New York. Beechcraft East then sold the plane to Irwin Feiner of Ocala, Florida, who then resold it to Beechcraft East. Beechcraft East thereafter sold the airplane to Jen Rob in New Jersey.

In the State Court Action, Judge Arthur Minuskin issued an order denying a Beech motion to dismiss for lack of personal jurisdiction. Letter from Noah H. Kushlefsky to chambers, received October 17, 1988. Judge Minuskin held Beech had sufficient contacts in New Jersey to support personal jurisdiction in New Jersey. Relying on *Asahi Metal Ind. v. Superior Ct. of Cal., Solano Cty.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), Judge Minuskin found that Beech both placed its aircraft products into the stream of commerce and main-

---

**1.** In claiming that the pertinent transactions are "purposefully negotiated and completed in Kansas," Beech apparently contends that the sales were structured with a view toward avoiding

submission to the jurisdiction of the various states in which its airplanes are sold. *See* discussion, *infra* at 318.

tained purposeful contact with New Jersey through the sales and marketing activities of its employees.

*Discussion*

### A. *Issue Preclusion*

Before addressing the substance of the Beech jurisdictional defense, the possible preclusive effect of the prior state court judgment must be examined.[2] Congress has provided that "judicial proceedings shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of [the] State ... from which they are taken." 28 U.S.C. § 1738.[3] Based upon this statutory direction, federal courts are to raise the issue of the preclusive effect of prior state court rulings whenever the courts of the state "from which the judgments emerged would do so." *Kelly v. TYK Refractories Co.*, 860 F.2d 1188, 1193 (3d Cir. 1988) (quoting *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980)); *see also VanDissel v. Jersey Cent. Power & Light*, 194 N.J.Super. 108, 121–122, 476 A.2d 310 (App.Div.), *cert. denied*, 99 N.J. 186, 491 A.2d 690 (1984). Accordingly, the preclusive effect of the order denying the Beech motion in the State Court Action will be determined with reference to New Jersey law. *See Migra v. Warren County School District Board of Ed.*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Towers, Perrin, Forster & Crosby, Inc. v. Brown*, 732 F.2d 345 (3d Cir. 1984).

Res judicata and collateral estoppel are "related but independent concepts." *Gregory v. Chehi*, 843 F.2d 111, 115 (3d Cir. 1988). These doctrines generally prohibit relitigation of claims and issues decided in a prior proceeding. As summarized by the Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979):

Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.

(citing 1B J. Moore, Moore's Federal Practice ¶ 0.405(1) at 622–624 (2d ed. 1974)).

The term res judicata has been given a variety of meanings, some of which incorporate the distinct concept of collateral estoppel. *Gregory*, 843 F.2d at 115 (citing A. Vestal, Res Judicata/Preclusion, V–13 to 14 (1969)). "To reduce the confusion that resulted from the interchangeable use of these terms, the courts have refined the nomenclature used in the preclusion doctrine." *Id.* (citing *Wade v. City of Pittsburgh*, 765 F.2d 405, 408 (3d Cir.1985)). Following the guidance of the Supreme Court and the Restatement (Second) of Judgments, the terms "claim preclusion" and "issue preclusion" will be used. *See Migra*, 465 U.S. at 75, 104 S.Ct. at 892; *Gregory*, 843 F.2d at 115–116. The term claim preclusion replaces res judicata; the term issue preclusion replaces collateral estoppel. *Gregory*, 843 F.2d at 116.

Eason seeks to estop Beech from raising the specific issue of personal jurisdiction, invoking the doctrine of issue preclusion. *Plainfield v. Public Service Electric and Gas Co.*, 82 N.J. 245, 257, 412 A.2d 759 (1980) ("Collateral estoppel is that branch of the broader law of *res judicata* which bars relitigation of any issue which was actually determined in a prior action, generally between the same parties, involving a different claim or cause of action.") When a party asserts issue preclusion to block its opponent from raising an issue

---

2. While this issue was not raised by the parties in their initial submissions, because the state court order was filed while this motion was pending, additional briefing of this issue was requested.

3. In the Act of May 26, 1790, ch. 11, 1 Stat. 122 Congress required all federal courts to give such preclusive effect to state court judgments "as they have by law or usage in the courts of the state from [which they are] taken." In essentially unchanged form, the Act of May 26, 1790 is now codified as 28 U.S.C. § 1738.

which has already been litigated, it acts "offensively." Defensive issue preclusion is generally asserted by a defendant to preclude a plaintiff from relitigating identical issues by "merely 'switching adversaries.'" *Parklane Hosiery,* 439 U.S. at 328, 99 S.Ct. at 650.

The focus of issue preclusion is efficiency. *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–329, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). Its purpose is to prevent the relitigation of issues previously resolved, thereby promoting judicial economy. *Parklane Hosiery,* 439 U.S. at 326, 99 S.Ct. at 649. Under New Jersey law, the doctrine of issue preclusion requires a "discretionary weighing of economy against fairness." *Kortenhaus v. Eli Lilly & Co.,* 228 N.J.Super. 162, 165, 549 A.2d 437 (App. Div.1988). Whether issue preclusion applies depends upon a variety of factors, "all of which are considered because they contribute to the greatest good for the greatest number so long as fairness is not sacrificed on that altar." *State v. Gonzalez,* 75 N.J. 181, 191, 380 A.2d 1128 (1977) (quoting *Continental Can Co. v. Hudson Foam Latex Products, Inc.,* 129 N.J.Super. 426, 430, 324 A.2d 60 (App.Div.1974)).

Among the criteria to be considered before issue preclusion can be invoked are whether:

(i) the party to be estopped was a party or in privity with a party in the prior action;

(ii) the issue to be estopped is the same as that previously litigated; and

(iii) the issue was actually litigated (or finally resolved) and necessary to the prior judgment.

*See Glictronix Corp. v. American Tel. & Tel. Co.,* 603 F.Supp. 552, 565 (D.N.J.1984). After addressing these factors, a determination must be made as to whether preclusion would be fair. Did the party to be estopped have incentive to vigorously litigate the first action? If there is more than one judgment involved, are they consistent? Does the second action afford some procedural opportunities unavailable in the first action? And finally, would application

of issue preclusion otherwise be unfair to the defendant? *Id.*

### (1) *Privity*

New Jersey has abandoned the requirement of privity and adopted the modern rule of issue preclusion as stated in the Restatement (Second) of Judgments: "A party precluded from relitigating an issue with an opposing party ... is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue." *Id.* at § 29; *see Kortenhaus,* 228 N.J.Super. at 165, 549 A.2d 437. The requirement of mutuality—that neither party use a prior ruling as estoppel against the other unless both parties were bound by the ruling—also has been discarded by federal courts. *Parklane Hosiery,* 439 U.S. at 326–27, 99 S.Ct. at 649; *Blonder–Tongue,* 402 U.S. at 313, 91 S.Ct. at 1434. Accordingly, when assessing the applicability of issue preclusion, the question to be decided is "whether a party has had his day in court on an issue, rather than whether he has had his day in court on that issue against a particular litigant." *Gonzalez,* 75 N.J. at 189, 380 A.2d 1128 (quoting *McAndrew v. Mularchuk,* 38 N.J. 156, 161, 183 A.2d 74 (1962)).

In this case, Beech is a named defendant in both the State Court Action and this action. Although the plaintiffs are different in each suit, they are each represented by the same law firm, the complaints arise out of a single occurrence and Beech has an equally strong incentive to avoid the jurisdiction of the state and federal courts (and apparently was represented by the same law firm in each action).

### (2) *Identity of Issues*

Not only does the cause of action in both lawsuits arise out of a single occurrence, but Beech asserted the identical personal jurisdiction defense in the State Court Action. Beech and Eason (by virtue of Eason's representation by the same law firm which represents Ramsay) had the opportunity to fully litigate this issue in the State

Court Action. As Judge Minuskin indicated in his opinion from the bench, both parties presented extensive submissions; the arguments raised were carefully considered. Nothing in the record indicates that the arguments presented in the State Court Action in any way differ from those articulated here.

### (3) *Finality*

Beech contends that under New Jersey law an interlocutory order of a state court denying a motion to dismiss for lack of personal jurisdiction is not "final" for the purposes of issue preclusion. Accordingly, Beech argues the application of issue preclusion in this case is not appropriate.

Beech has presented an array of cases supporting the proposition that a "valid and final judgment" is essential in order to invoke issue preclusion. *See McLendon v. Continental Group, Inc.,* 660 F.Supp. 1553, 1560 (D.N.J.1987) (one element of issue preclusion is that the issue had been decided by a "valid and final judgment"); *State v. Redinger,* 64 N.J. 41, 45, 312 A.2d 129 (1973) ("[W]hen an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated ... in any future lawsuit."); *Gregory Marketing Corp. v. Wakefern Food Corp.,* 207 N.J.Super. 607, 621, 504 A.2d 828 (Law Div.1985) (issue must be determined by a "valid and final judgment"); *see also Nanavati v. Burdette Tomlin Memorial Hospital,* 857 F.2d 96, 114 n. 17 (3d Cir.1988) (For purposes of claim preclusion "[a] cause of action once finally determined between parties on the merits by a tribunal having jurisdiction cannot be relitigated by those parties...." (citations omitted)).

The case law defining the term "finality" for the purposes of preclusion is sparse and, as a result, the precise definition of "finality" in this context remains illusive. Whether a judgment will be considered final for the purposes of issue preclusion turns on "such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Glictronix,* 603 F.Supp. at 573 (quoting *Lummus Co. v. Commonwealth Refining Co.,* 297 F.2d 80, 89 (2d Cir.), *cert. denied,* 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1981)).

In this case, there is no indication that Judge Minuskin's order was tentative or subject to further consideration. *See* 18 C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 4427 at 270 (1981) (hereinafter "Federal Practice and Procedure"). Furthermore, Beech does not contest the adequacy of the hearing in state court. Although Beech indicated in oral argument that it would not seek interlocutory appeal of Judge Minuskin's order, it appears the opportunity for review on appeal has not been waived. Failure to take an available appeal, however, does not defeat issue preclusion. *Id.*

In *Wade v. City of Pittsburgh,* 765 F.2d 405, 411 (3d Cir.1985), it was noted the concept of "judgment on the merits" is far less important for issue preclusion than for claim preclusion. Under the doctrine of issue preclusion, "even a 'non-merits judgment' is conclusive as to those matters actually adjudged." *Id.* (quoting *Acree v. Airline Pilots Ass'n,* 390 F.2d 199, 203 (5th Cir.1968)). While a judgment dismissing an action for lack of personal jurisdiction may not be on the merits for purposes of claim preclusion, it may be preclusive on the jurisdiction issue. 18 Federal Practice and Procedure § 4432 at 298. Accordingly, the standard of finality for issue preclusion is more relaxed than for claim preclusion. *Id.* § 4434 at 321; Restatement (Second) of Judgments § 41; *Kaspar Wire Works, Inc. v. Leco Engineering & Mach.,* 575 F.2d 530, 539 n. 11 (5th Cir.1978).

Analogously, it is instructive to consider the meaning of finality for purposes of appeal.[4] An order is deemed final for appeal if it conclusively determines the disposition of a disputed issue, resolves an important issue completely separate from the merits of the action and is effectively unre-

---

4. "Traditionally, finality was identified for purposes of preclusion in much the same way as it was identified for purposes of appeal. *See* Re-statement (Second) of Judgments, 1981, § 13, comment b." 18 Federal Practice and Procedure § 4432 at 298–299.

viewable on appeal from a final judgment. *In re Bobroff,* 766 F.2d 797, 800 (3d Cir. 1985) (citing *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). The state court's resolution of the jurisdictional issue in this matter does not conclusively determine the entire suit against Beech, but it does resolve an important issue independent of the merits of the action. Nevertheless, the issue of jurisdiction is reviewable on appeal.

Although there is no reason to consider the state court determination tentative, because Judge Minuskin's order may be reviewed at a later date, the finality of his judgment that Beech has minimum contacts with the State of New Jersey is subject to question. A prior state court ruling on the issue of personal jurisdiction may be upset long after entry of a judgment in federal court which relied on the conclusiveness of the state court order. Just as an interlocutory appeal would be wasteful, preclusion of a provisionally resolved issue would not be appropriate. 18 Federal Practice and Procedure § 4432 at 299. For this reason, it has been suggested that the costs of duplicative proceedings—that is, companion proceedings in state and federal courts which both raise an identical jurisdictional issue—may be less onerous than the potential for confusion if the earlier ruling on jurisdiction is reversed. *Id.*

### (4) *Fairness*

In its supplemental papers opposing the use of issue preclusion, Beech does not contend that it is subject to any procedural disadvantage in this second action. Aware

that both the pilot and co-pilot were killed in the November crash and that the State Court Action represented only half of its potential liability, it was in the best interest of Beech to vigorously litigate the jurisdiction issue in state court. As Judge Minuskin's opinion indicates, Beech was an aggressive litigant in the earlier proceeding.

Although concerns for judicial economy counsel that Beech be precluded from relitigating the identical *in personam* defense in federal court, the special nature of such preclusion raises further questions of fairness. In *Parklane Hosiery,* the Supreme court accorded the offensive use of issue preclusion only guarded endorsement because of the potential for abuse by litigous plaintiffs.[5] By initiating a parallel lawsuit in a different forum, a plaintiff reaps the advantage of two independent determinations. Afforded "two bites of the apple," the plaintiff can adopt a "wait and see" attitude "in the hope that the first action by another plaintiff will result in a favorable judgment." *Parklane Hosiery,* 439 U.S. at 330, 99 S.Ct. at 651. For this reason, offensive issue preclusion is disfavored when the second plaintiff "could easily have joined in the earlier action." *Id.* 439 U.S. at 331, 99 S.Ct. at 652.

In the instant case, the potential for abuse is troubling. The same law firm represents both plaintiff Ramsay in the State Court Action and plaintiff Eason in this federal court action. Eason could have easily intervened in the state action and consolidated the entire litigation. The tactical advantage of bringing separate actions is obvious.[6] The plaintiffs' attorneys

---

5. "[O]ffensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries.' ... Thus, defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the

first action by another plaintiff will result in a favorable judgment.... Thus, offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action." *Parklane Hosiery,* 439 U.S. at 329–30, 99 S.Ct. at 650–51. (citations and footnotes omitted).

6. It is noted that this strategy may raise problems in the future. If either action evolves so as to make the impleading of the other plaintiff for negligent conduct appropriate, the plaintiffs' law firm *may* confront a potential conflict of interest.

can experiment with one strategy in state court and, if unsuccessful, devise a different approch for the federal action. The doctrine of issue preclusion, however, was not intended to be used in this way. Such manuevering, rather than promoting judicial economy, encourages excessive and superfluous litigation.

Having considered the various factors counselling for and against invoking the state court's determination that Beech has the requisite minimum contacts with New Jersey, it appears that an independent federal court resolution of this issue is warranted. Although, as noted, Beech has indicated it will not seek an interlocutory appeal of Judge Minuskin's finding of personal jurisdiction, the entire matter, including this issue, may be appealed at a later date. This possibility renders the state court determination too insecure for reliance. Further, the importance of discouraging plaintiffs like Eason from adopting a two-pronged "wait and see" litigation strategy must be underscored. This wasteful abuse of diversity jurisdiction is clearly not an appropriate use of issue preclusion. Accordingly, the State Court Action will not be accorded preclusive effect and Beech's remaining arguments will be considered.

### B. *Personal Jurisdiction* [7]

Personal jurisdiction and venue, although closely related issues which determine where a suit will be adjudicated, require separate consideration. "The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum...." *Leroy v. Great Western United Corp.,* 443 U.S. 173, 180, 99 S.Ct. 2710, 2715, 61 L.Ed.2d

464 (1979).[8] When assessing the propriety of exercising personal jurisdiction over a party, the initial inquiry is two-pronged: (a) does the exercise of personal jurisdiction comport with the local statute authorizing jurisdiction; and (b) is this exercise compatible with due process? *Max Daetwyler Corp. v. Meyer,* 762 F.2d 290, 293 (3d Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 383, 88 L.Ed.2d 336 (1985); *Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni,* 628 F.2d 652, 667 (1st Cir.), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1980).

■ As implicated by the first prong of this analysis, a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state. Fed.R.Civ.P. 4(e); *Provident Nat. Bank v. Cal. Red. Sav. & Loan Ass'n,* 819 F.2d 434, 436 (3d Cir.1987). New Jersey courts "allow out-of-state service to the uttermost limits permitted by the United States Constitution." *Avdel Corp. v. Mecure,* 58 N.J. 264, 268, 277 A.2d 207 (1971). Accordingly, the New Jersey long arm statute extends as far as is constitutionally permissible under the due process constraints of the fourteenth amendment. *De-James v. Magnificence Carriers,* 654 F.2d 280, 284 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981). Federal courts sitting in New Jersey apply New Jersey law when interpreting the meaning of due process for the purposes of personal jurisdiction. *Western Union Telegraph v. T.S.I.,* 545 F.Supp. 329, 332 (D.N.J.1982).

In *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court abandoned traditional notions of jurisdiction whereby a

---

7. Personal jurisdiction, delineating a state's authority to adjudicate, technically incorporates *in personam* (jurisdiction over a person), *in rem* (jurisdiction over property) and *quasi in rem* (jurisdiction over an individual's interest in property). *See Shaffer v. Heitner,* 433 U.S. 186, 199, 97 S.Ct. 2569, 2577, 53 L.Ed.2d 683 (1977); J. Friedenthal, M. Kane, A. Miller, *Civil Procedure,* Ch. 3. The issue raised in this case concerns jurisdiction over a corporation, or *in personam* jurisdiction. The term "personal juris-

diction" will be used to refer to *in personam* jurisdiction over Beech.

8. In *Leroy,* the Court made this observation but then chose to consider venue before addressing personal jurisdiction, explaining "when there is a sound prudential justification for doing so, we conclude that a court may reverse the normal order of considering personal jurisdiction and venue." 443 U.S. at 180, 99 S.Ct. at 2715.

state's power over a person was predicated upon control over that person, in favor of allowing personal jurisdiction whenever the defendant has certain "minimum contacts" with the state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 316, 66 S.Ct. at 158. A defendant's actual presence within the forum state is no longer required in order for personal jurisdiction to attach. This relaxation of the due process constraints on personal jurisdiction evolved to keep pace with the growing complexity of society.

> As technological progress has increased the flow of commerce between the states, the need for jurisdiction over non-residents has undergone a similar increase. At the same time, progress in communication and transportation has made the defense of a suit in a foreign tribunal less burdensome.

*Hanson v. Denckla,* 357 U.S. 235, 250–51, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958).

■ It is realistically possible that a defendant corporation may have the required minimum jurisdictional contacts with all fifty states resulting from its business activities. But *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), expressly rejected the idea that a consumer's unilateral act of bringing the defendant's product into a forum state was a sufficient constitutional basis to assert personal jurisdiction over the defendant. *See also Asahi,* 480 U.S. at 109, 107 S.Ct. at 1031. Similarly, the placement of a product into the stream of commerce which flows into a given state is not in and of itself sufficient to confer jurisdiction. *Id.* at 112, 107 S.Ct. at 1033. Thus, a defendant maintains some control over its jurisdictional destiny and can conform its business affairs so as to avoid the jurisdictional reach of a given state. *See Charles Gendler & Co v. Telecom Equipment Corp.,* 102 N.J. 460, 470–71, 508 A.2d 1127 (1986).

Beech contends that it has intentionally crafted its commercial structure to limit jurisdiction, basing all of its business transactions in its home state of Kansas. While such purposeful jurisdictional manipulation is permissible within the due process guidelines of *International Shoe,* merely intending to avoid the jurisdiction of New Jersey is insufficient. Beech must have so limited its contacts with New Jersey that the exercise of jurisdiction over Beech would "offend traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158.

■ Minimum contacts with a state are shaped by purposeful conduct making it reasonable for the defendant to anticipate being haled into court there. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. These contacts must have a basis in "some act by which the defendant purposely avails itself of the privilege of conducting activity within the forum state, thus invoking the benefits and protection of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another person.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (citations omitted). In this way, the fairness of exercising jurisdiction over a defendant results from a reciprocal relationship between that defendant and the forum state. By exercising the privilege of conducting activities within the forum state, the defendant is put on "clear notice" that it is subject to suit there. *Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239.

In assessing the sufficiency of minimum contacts for personal jurisdiction, the court must focus upon the "relationship among the defendant, the forum and the litigation." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)). The contacts between the defendant and the forum must be judged "in light of the claim," the analysis focusing on whether it is "fair" to compel the defendant to defend in the forum

state. *Keeton*, 465 U.S. at 775, 104 S.Ct. at 1478.

■ After a jurisdictional defense is raised, the plaintiff bears the burden of demonstrating that the defendant's affiliating contacts with the forum state are sufficient to give the court personal jurisdiction. *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances*, 723 F.2d 357, 362 (3d Cir.1983). To meet this burden, the plaintiff must establish either that the particular cause of action arose from the defendant's activities within the forum state ("specific jurisdiction") or that the defendant has "continuous and systematic" contacts with the forum state ("general jurisdiction"). *Provident National Bank*, 819 F.2d at 437 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984)). If the cause of action is not related to the defendant's contacts with the forum state, the plaintiff must make a stronger showing that the defendant has maintained "continuous and systematic" forum contacts. *Reliance Steel Products Company v. Watson, Ess, Marshall & Enggas*, 675 F.2d 587, 588–89 (3d Cir.1982).

■ The sequence of events giving rise to the instant suit touched many states. Beech apparently manufactured the airplane in Kansas. It sold the airplane to its Indiana subsidiary, which sold it to a New York subsidiary. After a brief presence in Florida, the airplane was sold to Jen Rob in New Jersey. Component parts, produced by King Radio and Bendix, may have originated in Kansas, King Radio's principal place of business, or in Delaware or in Virginia, allegedly Bendix's places of business. Jen Rob bought and maintained the airplane in New Jersey. Linden maintained the airplane in New Jersey. The airplane took off from New Jersey and crashed in Rhode Island.

Eason does not allege that there is specific jurisdiction over Beech. Rather, Eason asserts that Beech's "continuous and systematic" business contacts with New Jersey provide the basis for asserting general jurisdiction over the corporation.

In a similar case brought in the Southern District of Texas, survivors of parties killed in a crash of a Beech airplane attempted to assert general jurisdiction over Beech on the basis of its business contacts with Texas. The Fifth Circuit concluded that Beech's carefully structured business activities only tangentially influenced the Texas economy and were not sufficient to confer general jurisdiction. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370 (5th Cir.1987).

The Beech airplane in *Bearry* was sold in Texas, but the contracts for the sale of Beech airplanes to Texas residents were negotiated in Kansas through Texas dealers and the airplanes were sold by independent retailers. The court noted: "Beech exercised its right to structure its affairs in a manner calculated to shield it from the general jurisdiction of the courts of other states such as Texas, carefully requiring the negotiation, completion and performance of all contracts in Kansas." *Id.* at 375–76. Concluding Beech had not availed itself of the "benefits and protections of the laws of Texas," but had instead "calculatedly avoided them," the court dismissed the case for lack of personal jurisdiction.

Although *Bearry* is persuasive precedent, it is not dispositive as to whether Beech's corporate calculus was equally as successful in maintaining immunity from the jurisdiction of New Jersey and whether there are other counterveiling considerations distinguishing this case. No single factor is determinative in evaluating the sufficiency of Beech's contacts with New Jersey. It is the "total factual setting" which will establish whether the combined strength of those contacts satisfies the requirements of due process. *Young v. Gilbert*, 121 N.J.Super. 78, 296 A.2d 87 (Law Div.1972).

Maintaining that it lacks "minimum contacts" with New Jersey sufficient to justify the exercise of general jurisdiction, Beech points largely to its physical presence outside of the state. Beech is incorporated in Delaware, with its principal place of business in Kansas. It owns no property in New Jersey, maintains no bank accounts

here, and has no employees in the state.[9] Defendants' Brief at 34–35. Beech characterizes its advertising as "intermittent" and concentrated in aviation and business magazines with national and international circulation. *Id.* at 35. The locus of Beech's business transactions is Kansas: money and products change hands there. *Id.*

Eason conducted extensive discovery into Beech's contacts with New Jersey and developed certain data. From 1984 through 1988, Beech sold thirty-one airplanes to aviation centers in New Jersey. Plaintiff's Exhibit 1, Attachment A. Eight of those planes were later sold in New Jersey to New Jersey residents. Plaintiff's Exhibit 3. Eason contends that because airplanes are a high cost, low volume product, these sales represent a significant quantity of business. During the course of its business in New Jersey in the past five years, Beech did specifically send employees into New Jersey more than one hundred times. These employees entered New Jersey for management assignments, to visit prospective customers, for sales promotion and to demonstrate airplanes.

In its Supplemental Response to Interrogatory No. 8, Beech admitted that its employees entered New Jersey specifically to assist distributors or demonstrate Beech products on twenty-four occasions from 1984 to date.[10] Letter of June 24, 1988, Supplementing Beech's Response to Jurisdiction Interrogatories, Exhibit 10 (Supplemental Interrogatory Response) ("Beech employees on the occasions of their visits demonstrated Beech products, provided miscellaneous franchise support services and assisted owners or dealers with respect to service difficulties on particular aircraft.")

Beech advertised in publications such as *The Wall Street Journal, Forbes* magazine, *Business and Commercial Aviation, AOPA Pilot,* and other nationally circulated magazines. Beech also regularly entered into contracts for the purchase of goods from New Jersey companies. Beech has provided a current list of over 250 New Jersey companies from which it has purchased goods. *Id.* at Exhibit 11. From 1984 to the present, Beech has made 2,239 purchases from companies located in New Jersey. Beech parts and airplanes were sold to residents of New Jersey through Ronson Aviation in Trenton, New Jersey.[11]

In its Sales and Service Agreement with Ronson Aviation, Inc. (doing business as Ronson Beechcraft),[12] Beech set market sales objectives, prescribed an inventory of parts and equipment, mandated that only Beech parts and equipment may be sold for Beech airplanes, set standards for the size and maintenance of Ronson's facilities, and set minimum order requirements and working stock levels. Beech influenced the marketing of its airplanes at every level from controlling the signs erected by Ronson to directing that Ronson participate in Beech's promotional, merchandising and advertising programs and requiring that Ronson disseminate Beech's performance data. Beech also monitored Ronson's monthly and annual financial, operational and management reports and retained the right to inspect Ronson's facilities, records, supplies and personnel. This involvement with the intricacies of the sale of Beech airplanes in New Jersey is significant.

Eason argues that Beech's network of distribution is sufficiently concentrated in New Jersey to satisfy the constitutional requirements of minimum contacts and to

9. Beech acknowledges it "occasionally" sends employees to New Jersey at the request of independent New Jersey distributors to assist in the demonstration of airplanes.

10. It is noted that Beech admitted to over one hundred total employee trips during this time period. Plaintiff's Exhibit 1, Attachment "B." *See supra* at 314.

11. Ronson Aviation only recently terminated its affiliation with two aviation centers in New Jersey—Hammonton Aviation in Hammonton, New Jersey and Beechcraft East in Teterboro, New Jersey.

12. The precise nature of the business relationship between Ronson Aviation and Beech is not clear. However, given Ronson Aviation's use of the name "Beechcraft," it appears there may be some substantive affiliation between the corporations.

make the exercise of personal jurisdiction both reasonable and forseeable. Based on the information provided by Beech, it appears that it has made economic entry into New Jersey. *See Ketcham v. Charles R. Lister International, Inc.*, 167 N.J.Super. 5, 9, 400 A.2d 487 (1979).

Some courts have found sufficient contacts for personal jurisdiction "where virtually any form of economic entry into the state was evident." *Id.* (quoting *Amercoat Corp. v. Reagent Chem & Research, Inc.*, 108 N.J.Super. 331, 342, 261 A.2d 380 (App. Div.1970)). Indeed, New Jersey has adopted an especially permissive approach to minimum contacts analysis: "jurisdiction has been exercised wherever possible when a liberal and indulgent view of the facts reasonably support the presence of the flexible concepts of 'fair play and substantial justice.'" *Id.* 167 N.J.Super. at 7, 400 A.2d 487.

Assessing the nature, continuity and regularity of a corporation's economic entry or presence into a state is no simple task. In New Jersey, the continuity of a defendant's activities is accorded more significance than the quantum of activities. *Amercoat Corp.*, 108 N.J.Super. at 342, 261 A.2d 380. This approach avoids the potential for the due process calculus deteriorating into an arithmetic balancing of how many products a manufacturer sold in a given forum. Although Beech has sold only eight airplanes in New Jersey during the past five years, these transactions are not as insignificant as Beech seeks to imply. The manufacture of airplanes, unlike television sets, is not a high volume industry. Further, as Beech's contacts with local independent distributors reveal, the sale of its products in a distant state "is not simply an isolated event, but the result of the corporation's efforts to cultivate the largest possible market for its product." *Charles Gendler & Co.*, 102 N.J. at 477–8, 508 A.2d 1127.

Although *World–Wide Volkswagen* rejected the stream of commerce theory as an independent basis for finding personal jurisdiction over a non-resident distributor and dealer, it did not rule out the consideration of a manufacturer's commercial activities aimed at generating business within the forum state as a factor supporting jurisdiction. *See Carty v. Beech Aircraft Corp.*, 679 F.2d 1051, 1062 (3d Cir.1982). A modified stream of commerce theory, adopted by the New Jersey Supreme Court in *Gendler*, places the manufacture and distribution of a product at the start of a distribution chain and interprets the continuing links in that chain as involving purposeful conduct intended to make a product available for purchase in as many fora as possible. *Gendler*, 102 N.J. at 477, 508 A.2d 1127 (quoting *Nelson by Carson v. Park Indus., Inc.*, 717 F.2d 1120, 1125 (7th Cir. 1983)), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). This jurisdictional theory developed "as a means of sustaining jurisdiction in products liability cases in which the product has travelled through an extensive chain of distribution before reaching the ultimate consumer." *DeJames*, 654 F.2d at 285; *see also Daetwyler*, 762 F.2d at 298.[13]

In *Asahi*, decided after *Gendler* and *Amercoat*, the Supreme Court further refined the stream of commerce theory: "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state," and hence no longer suffices to establish the requisite minimum contacts for personal jurisdiction. 480 U.S. at 112, 107 S.Ct. at 1033. The Court continued: "Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum state," for example, designing the product for the market, advertising, establishing channels

---

**13.** Discussing the minimum contacts analysis set forth in *World–Wide Volkswagen*, the *Daetwyler* court stated: "The decision may thus be read to suggest that a defendant manufacturer need not have transacted business in the forum state if it has attempted to cultivate a market for its goods within the state. The requirement that a foreign manufacturer attempt to develop a market, however, must subsume those purposeful affiliation requirements, beyond forseeability, which allow a manufacturer to anticipate being sued within the forum state." 762 F.2d at 298 n. 11.

for providing advice to customers or marketing through a distributor or agent. *Id.*

The appearance of Beech products in New Jersey alone may be an insufficient foundation for personal jurisdiction. However, when a corporation arranges to have its products sold in a state, even though independent agents, a more substantial relationship envisioned by *Asahi* has evolved. Beech cannot avoid being subject to the jurisdiction of a state simply by arranging for the indirect distribution of its goods rather than entering a local market independently. In the modern business context commercial transactions are sufficiently complex that the assistance of middle level distributors is frequently utilized. Foreign manufacturers cannot insulate themselves from jurisdiction by erecting a sophisticated web of distribution. *Gendler*, 102 N.J. at 478, 508 A.2d 1127.

Beech's careful supervision of its local distributor Ronson Aviation underscores its interest in soliciting a New Jersey market for its products. By sending Beech representatives into New Jersey, Beech provided direct service to local customers and further developed its business relationship with this state. The placement of an intermediary agent between Beech and the ultimate consumer of its products does not disable Beech from enjoying the benefits of New Jersey's legal forum and protections. The "purposeful availment" analysis of *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183, "turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir.1986). Eason did nothing to enhance Beech's contacts with New Jersey. By soliciting business in New Jersey, Beech affirmatively and independently invoked the benefits of the laws of the forum state. *Id.*

Beech, by virtue of its sales and employee visits to the state, did make efforts to solicit New Jersey business. Further, the control it exerted over its sales affiliates in New Jersey and the support services it

provided to local aviation centers are consistent with business entry into the state of New Jersey. Beech expected that its products would be sold in New Jersey and its purposeful contacts with this state contributed to the orchestration of those sales. *Id.* at 840. Accordingly, Beech is subject to jurisdiction in the District of New Jersey.

### C. *Venue*

■ Beech also argues that venue is not proper in this district. Restrictions upon the venue in which a plaintiff may sue in federal court are statutory in origin. Congress, in passing venue statutes, has limited a plaintiff's choice of venue in order to protect defendants from the inconvenience and expense of having to defend actions in distant fora. *Denver & Rio Grande Western R.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 560, 87 S.Ct. 1746, 1748, 18 L.Ed.2d 954 (1987). Congress created venue requirements "primarily [as] a matter of convenience of litigants and witnesses." *Id.* A plaintiff is generally conceded the choice of forum "so long as the requirements of personal and subject matter jurisdiction, as well as venue, are satisfied." *Reyno v. Piper Aircraft*, 630 F.2d 149, 159 (3d Cir.), *rev'd on other grounds*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (citing *Koster v. Lumbermen's Mutuality Casualty Co.*, 330 U.S. 518, 524, 67 S.Ct. 828, 832, 91 L.Ed. 1067 (1947)). Although the plaintiff's preference is accorded weight, it will not be determinative if the defendant establishes "such oppressiveness and vexation ... as to be out of all proportion to plaintiff's convenience" or if trial in the chosen forum is inappropriate because of "considerations affecting the court's own administrative and legal problems." *Id.* Accordingly, in contrast with jurisdiction, the burden of proving that venue is improper rests with the movant. *Myers v. American Dental Ass'n*, 695 F.2d 716, 724 (3d Cir.1982), *cert. denied*, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983).[14]

14. The *Myers* court explained this allocation of burdens by pointing out that because federal

courts are of limited jurisdiction, a presumption arises that they are without jurisdiction "until

Subject matter jurisdiction over this case is based upon diversity of citizenship, 28 U.S.C. § 1332. Venue in diversity actions is governed by 28 U.S.C. § 1391. Subsection (a) states:

A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

Venue may be found in the District of New Jersey on two grounds: first, that all defendants reside in New Jersey and second, that the cause of action arose in New Jersey.[15]

### (1) *Corporate Residence*

Defendants Jen Rob, Linden Avionics, King Radio, Bendix and Allied Signal have not contested submitting to venue in the District of New Jersey. Beech argues that it does not reside in New Jersey within the meaning of § 1391(c). 28 U.S.C. § 1391(c) states:

A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

There has been much dispute among the district courts regarding the parameters of corporate residency. Most courts construe the three-pronged definition of residence in section 1391(c) literally, holding that the corporation is a resident subject to suit "in each division of the district where any of the three alternatives are met." *England v. ITT Thompson Industries, Inc.*, 856 F.2d 1518, 1519 (11th Cir.1988). Beech is neither incorporated nor licensed to do

business in New Jersey. At issue, then, is whether Beech properly can be considered to be "doing business" in New Jersey.

■ No uniform definition of "doing business" has been adopted by this circuit or by other circuit courts. *Vivadent (USA), Inc. v. Darby Dental Supply*, 655 F.Supp. 1359, 1361 (D.N.J.1987). Many courts have construed "doing business" for venue purposes as coextensive with the constitutional test for minimum contacts associated with service of process. *See* 15 Federal Practice and Procedure § 3811 at 117–118; *Du–Al Corp. v. Rudolph Beaver, Inc.*, 540 F.2d 1230, 1233 (4th Cir.1976); *Houston Fearless Corp. v. Teter*, 318 F.2d 822, 825 (10th Cir.1963); *Transload & Transport, Inc. v. Tennessee Valley Towing, Inc.*, 609 F.Supp. 185, 186 (D.La.1985); *Galonis v. National Broadcasting Co., Inc.*, 498 F.Supp. 789, 791 (D.N.H.1980).[16]

Venue and jurisdiction, however, are distinct concepts addressed to very different concerns. As discussed above, personal jurisdiction involves a court's power over a party. Venue, in contrast, concerns "not whether the court has authority to hear the case but simply where the case may be tried." (*Myers v. American Dental Ass'n*, 695 F.2d 716, 724 (3rd Cir.1982)).

Other courts have construed "doing business" for venue purposes to require a closer relationship between the defendant and the forum than the minimum contacts analysis for personal jurisdiction. *See J.L. Clark Mfg Co. v. Gold Bond Corp.*, 629 F.Supp. 788 (E.D.Pa.1985); *Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886, 889–890 (S.D.N.Y.1974); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 374 F.Supp. 184, 189 (D.Del.1974); *Medicenters*

---

the contrary affirmatively appears." 695 F.2d at 724. A motion to dismiss for improper venue, in contrast, "is not an attack on jurisdiction but only an affirmative dilatory defense." *Id.* Because the plaintiff does not have to include allegations in its complaint showing venue to be proper, on a motion for improper venue the movant has the burden of proving the affirmative defense by asserting it. *Id.*

**15.** Christopher Eason is a resident of the State of New York.

**16.** In support of this position, Professor Moore argues venue should be regarded as proper whenever the court has jurisdiction over the corporation:

[I]f a corporation is amenable to service of process it should be held to be doing business for venue purposes.... If it is not unfair to subject the corporation to the court's jurisdiction for service of process, it seems wise and not unfair to hold that there is proper venue. 1 J. Moore, Moore's Federal Practice ¶ 0.142 (2d ed. 1985).

*of America, Inc. v. T & V Realty & Equipment Corp.,* 371 F.Supp. 1180, 1182 (D.Va. 1974); *see also* Note, *Federal Venue Over Corporations Under Section 1391(c): Plaintiff Corporations, the Judicial District Litigation, and "Doing Business,"* 12 Ga.L.Rev. 296, 308, 322 (1978).

This circuit has not directly addressed the interaction of minimum contacts analysis and venue considerations for the purposes of clarifying "doing business" under § 1391(c). In *Fraley v. Chesapeake Ohio Railway Company,* 397 F.2d 1, 4 (3d Cir. 1968), *on remand,* 294 F.Supp. 1193 (W.D. Pa.1969), the Third Circuit seemed to equate "doing business" under § 1391(c) with the minimum contacts analysis for personal jurisdiction. *Fraley* involved a complaint filed under the Federal Employers' Liability Act ("FELA") which contained a venue provision adopting the "doing business" language of § 1391(c).[17] However, the court in *Fraley* did not specifically rule on the issue and remanded the case for further factual determinations. Noting the absence of controlling precedent, one court in this district adopted the reasoning set forth by the First Circuit in *Johnson Creative Arts v. Wool Masters,* 743 F.2d 947 (1st Cir.1984).[18] *Vivadent,* 655 F.Supp. at 1361.[19]

*Wool Masters* involved both a federal trademark infringement action pursuant to 15 U.S.C. § 1125(a) and claims for breach of contract and unfair competition. Because the court's federal question jurisdiction was invoked, § 1391(b), governing venue in cases not based solely on diversity, was implicated. The *Wool Masters* court emphasized the distinctions between jurisdiction and venue, concluding that the policy objectives of minimum contacts analysis (due process/fairness) were not synonomous with those of venue (convenience/fairness). This emphasis, however, appears to have been influenced by the existence of a federal trademark question.

It seems the *Wool Masters* court was concerned that equating these two concepts (venue and personal jurisdiction/minimum contacts) in a case founded on federal question jurisdiction would lead to the anomolous result of venue being proper in any district in which a corporate defendant constitutionally could be subjected to service. 743 F.2d at 950. Distinguishing the constitutional and statutory analysis required to decide a personal jurisdiction issue in a diversity action from the distinct constitutional inquiry raised by a federal question case, the court explained:

> [Fed.R.Civ.P] Rule 4(e) allows for service outside the state when authorized by a statute of the United States or when a statute or rule of court of the state in which the district court is held provides for such service. The state statutes referred to cannot provide for service of process on a defendant outside the respective states unless the defendant has had contact with that state that is required by the fourteenth amendment.... It is the reference to the "long arm" statutes of the various states that incorporates the requirement of minimum contacts as a precondition for extraterritorial service of process.

Since due process would allow a federal court in a *federal question* case to issue service of process nationwide, and does not require that a corporation have any contact with a particular district in

---

**17.** The court in *Philadelphia Housing Auth. v. American Radiator and S. San Corp.,* 291 F.Supp. 252, 257 (E.D.Pa.1968), construed *Fraley* as limited to FELA actions. No rationale was given for this limitation.

**18.** Several other courts have adopted the First Circuit's test, refusing to find venue where a corporation's central activities are outside the forum state even though minimum contacts may be present. *See Maybelline v. Noxell Corp.,* 813 F.2d 901, 905 (8th Cir.1987) ("doing business for venue purposes should be subject ot a higher standard"); *Eli Lilly & Co. v. Home Ins.*

*Co.,* 794 F.2d 710, 721 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1060, 107 S.Ct. 940, 93 L.Ed.2d 990, 991 (1987) (a corporation is "doing business" under § 1391(c) whenever the Constitution would permit a state to require a foreign corporation to comply with a licensing scheme).

**19.** *Vivadent* involved a complaint brought under the Lanham Act. As with *Wool Masters,* venue in that case was controlled by 28 U.S.C. § 1391(b), governing venue of matters not founded solely on diversity. The significance of this point is discussed *infra* at 327.

order to be sued there, we cannot accept the proposition that venue is proper in any district in which a corporate defendant constitutionally could be subject to service. Under this argument, venue would be proper in any district in the United States in a case where a defendant has had "minimum contacts" with any part of the United States.

*Id.* (emphasis added).

When a case in federal court presents a "federally created right," the inquiry necessary to determine a defendant's amenability to service is not based on its affiliations with the forum state. Rather, the inquiry focuses upon "whether the defendant has certain minimal contacts with the United States." *Daetwyler,* 762 F.2d at 293 (quoting *Edward J. Moriarity & Co. v. General Tire & Rubber Co.,* 289 F.Supp. 381, 390 (S.D. Ohio 1967)). As the court in *Daetwyler* explained, "it is not the territory in which a court sits that determines the extent of its jurisdiction, but rather the geographical limits of the unit of government of which the court is a part." *Id.* (quoting *Cyromedics, Inc. v. Spembly, Ltd.,* 397 F.Supp. 287, 291 (D.Conn.1975)).

The *Wool Masters* court correctly noted that, in theory, if the test for venue were equated with the test for personal jurisdiction, a defendant in a federal question case would suffer the inconvenience of being vulnerable to suit in any of the ninety-four districts [20] within the United States. Accordingly, the court thought it more consistent with the underlying venue principles of fairness and convenience to "local-

ize" the doing business requirement of § 1391(c). *Id.* at 952. The test for doing business under § 1391(c) articulated by the *Wool Masters* court requires that the defendant corporation engage in local transactions "to such an extent and of such a nature that the state in which the district is located could require the foreign corporation to qualify to 'do business' there." *Id.*

However, although a federal statute could authorize, in a manner consistent with the due process constraints of the fifth amendment, nationwide personal jurisdiction based upon a defendant's aggregate national contacts, this type of statutory authorization must be specifically invoked. When a federal question case "arises under a federal statute that is silent as to service of process, Rule 4(e) adopts an incorporation approach requiring that both the assertion of jurisdiction and the service of process be gauged by state amenability standards." *Daetwyler,* 762 F.2d at 295. The jurisdiction analysis in this type of federal question case, then, reverts back to the same minimum contacts analysis invoked in diversity cases. *Id.* at 296 n. 7; *see* 4 Federal Practice and Procedure § 1075 at 312–13.[21] Accordingly, a defendant in a federal question case would not be likely to have minimum contacts with an indefinite number of states.[22]

Once the possibility of nationwide venue is diminished, the concerns expressed in *Wool Masters* are mitigated.[23] The case at bar, unlike *Wool Masters,* presents no federal question. The equation of "doing busi-

---

**20.** *Federal Court Management Statistics,* prepared by the Administrative Office of the United States Courts, lists ninety-four districts comprising the United States federal district court system. *Id.* at a-b.

**21.** The court in *Daetwyler* noted the potential constitutional dilemma this situation poses: a federal court may be compelled to refuse to adjudicate a federal claim because courts of the forum state could not accept jurisdiction. 762 F.2d at 296. Uniformity in this area would be enhanced if Congress passed a general federal question competence statute. *Id.*

**22.** In a diversity case when there is specific jurisdiction, venue would automatically lie in that district under § 1391(a) (venue is proper in the judicial district "in which the claim arose").

When general jurisdiction over a corporation is found based on that corporation's business contacts with the forum, it is more likely than not that venue should lie in that district as well, given the high quantum of affiliations necessary to comport with the due process/minimum contacts analysis.

**23.** The *Wool Masters* court's concern that venue in a federal question case may be proper in any district in the United States under a minimum contacts/doing business analysis is also addressed by the doctrine of forum non conveniens. A defendant brought to suit in a distant, inconvenient forum has the right to move for transfer pursuant to 28 U.S.C. § 1404(a).

ness" under minimum contacts and venue is thus not problematic. Although the difference between the policy concerns of jurisdiction and venue cannot be overemphasized, *Myers*, 695 F.2d at 724 (quoting *Wheatley v. Phillips*, 228 F.Supp. 439, 440 (W.D.N.C.1964), the venue test articulated in *Wool Masters* ignores practical and compelling similarities between jurisdictional and venue concerns. Both doctrines dictate the situs of the litigation and are intended to protect the defendant against the inequities of being compelled to defend in a distant forum. The minimum contacts rule adds a federalism component to this concern. *See* 15 Federal Practice and Procedure § 3811 at 121.

Congress affirmatively chose terminology for the venue statute which is identical with that used in minimum contacts analysis. "If Congress thought anything whatever about this provision, it is reasonable to suppose that it thought the familiar words 'doing business' were being used in their familiar sense." *Id.* at 122–123. With regard to diversity matters, the advantages of having a single standard of "doing business" for both doctrines is obvious.

Perhaps the most pressing problem presented by the *Wool Masters* rule is its direction that courts consider the corporate licensing requirements of the forum state when ruling on the propriety of venue. Venue is a question of federal law. *Leroy*, 443 U.S. at 183 n. 15, 99 S.Ct. at 2716 n. 15; *Accutest Corp. v. Accu Test Systems, Inc.*, 532 F.Supp. 416, 422 (D.Mass.1982). Accordingly, the forum state's statutory standards for corporate licensing are irrelevant. Criticizing the court's analysis in *Wool Masters*, Wright, Miller & Cooper explain:

> The licensing standard that the First Circuit chose ... has literally nothing to do with place of suit or protection against an inconvenient forum. The rules on when a state may require a foreign corporation to qualify if it wishes to do business there are derived from the Commerce Clause. One of the conse-

quences of the licensing standard the First Circuit has adopted is that a corporation will never be found to be "doing business" for purposes of § 1391(c) if it is doing a wholly interstate business within the state. This will prevent § 1391(c) from being used in many cases involving extensive activity by a corporation within the district.

15 Federal Practice and Procedure § 3811 at 121 (footnotes omitted).

By assessing venue in terms of a state's licensing requirements, the inquiry is made more complicated.[24] A court would be required to probe into what behavior a corporation must engage in in order to be licensed within a state. This may lead not only to confusion among different federal district courts interpreting state law requirements, but may also result in a lack of uniformity in the application of a statute "that should have one meaning throughout the country and should not be dependent on the vagaries of state laws apportioning business among the courts of a single state." *Carlson v. Alden Equities, Inc.*, 617 F.Supp. 536, 537 (D.C.Pa.1985) (quoting 15 Federal Practice and Procedure § 3803 at 12 (1976)).

Under any test for corporate residency under § 1391(c), the defendant's contacts must be "localized" such that the underlying purpose of the venue statute—"convenience of litigants and witnesses"—is served. *See Carlson*, 617 F.Supp. at 538 (citing *Denver R.G.W.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 560, 87 S.Ct. 1746, 1748, 18 L.Ed.2d 954 (1967)). As the prior discussion of personal jurisdiction indicates, there is no clear cut rule dictating when a defendant's contacts with the forum state are sufficient to subject it to such jurisdiction. "Doing business" is but a single element of a more complex calculus which includes careful evaluation of the content and quality of contacts with a state as well as consideration of the fairness of subjecting the defendant to jurisdiction. Similarly, the venue inquiry is

---

**24.** It is noted, however, that for federal question cases where the governing federal statute provides for nationwide service, the *Wool Masters* test would be helpful, locking in venue to a district convenient for the defendant by virtue of its business activities.

fact-sensitive, focusing on such factors as the general character of the corporation, the nature and scope of its business operations, the extent and continuity of its contacts with the forum. *Accutest Corp.*, 532 F.Supp. at 422.

As discussed earlier, Beech entered New Jersey in order to promote the sale of its products and provide support services to distributors. *See supra* at 321–22. Beech has instructed its corporation to consolidate most of its business transactions in one state, Kansas, although its products are sold throughout the country. The extent of the Beech business transacted in New Jersey is continuous and is consistent with making its products readily available to New Jersey consumers.

Beech is "doing business" in New Jersey within the meaning of § 1391(c). Its entry into each market must be independently assessed. In view of its history of business transactions with New Jersey distributors, compelling Beech to appear in this district is not an "oppressive" or "vexatious" inconvenience.[25]

### (2) *Where Claim Arose*

Because the gravamen of Eason's complaint—negligent maintenance of the airplane's equipment—is alleged to have occurred in New Jersey, venue is also proper under the provision of 28 U.S.C. § 1391(a) allowing venue to be found in the judicial district in which the claim arose. Responding to the problem of venue gaps—cases in which federal courts have jurisdiction but there is no district in which venue is proper—Congress amended the venue statute to authorize suit where the claim arose. *Brunette Machine Works, Ltd. v. Kockum Industries, Inc.*, 406 U.S. 706, 710 n. 8, 92 S.Ct. 1936, 1939 n. 8, 32 L.Ed.2d 428

(1972).[26] The Third Circuit has not yet had occasion to establish a test delineating the meaning of where a claim arises for venue purposes. The case law guiding § 1391(a) analysis is not crystal clear.[27] Three general standards, however, have emerged. When assessing where a claim arose under § 1391(a), courts look to:

(1) the place of injury;

(2) the "weight of contacts"; and

(3) whether a substantial part of the events or omissions giving rise to the claim occurred in the district.

*Hodson v. A.H. Robins Co., Inc.*, 528 F.Supp. 809, 813 (D.Va.1981), *aff'd*, 715 F.2d 142 (4 Cir.1983).

While the place where the claim arose is often obvious, the Supreme Court has recognized that there exist situations where it is not clear that a claim arose in one single district. *Leroy*, 443 U.S. at 185, 99 S.Ct. at 2717. Similarly, the deeds of an actor in one location may cause injury in numerous places. *Accutest*, 532 F.Supp. at 421. The choice of a single district in which to assert venue is a "much more difficult undertaking when sophisticated multistate activities of relative complexity are in issue." *Lamont v. Haig*, 590 F.2d 1124, 1133 (D.C.Cir.1978). In this type of situation, the plaintiff is free to choose between districts with approximately equal contacts. *Leroy*, 443 U.S. at 185, 99 S.Ct. at 2717.

The most obvious place of injury in this action is Rhode Island, where the airplane crashed. The complaint alleges several causes of action: wrongful death based on negligence, products liability and breach of warranty. Specifically, Eason alleges that the crash, death and resulting damages

**25.** It is also noted that due to the parallel litigation pending in Bergen County Superior Court, Beech must be present in New Jersey to defend that action. However, this is not a reason in itself to find venue proper.

**26.** *See also Leroy*, 443 U.S. at 184 n. 17, 99 S.Ct. at 2717 n. 17 ("As *Brunette* indicates, the amendment of § 1391 to provide for venue where the claim arose was designed to close the 'venue gaps' that existed under earlier versions of the statute in situations in which the joint tort-

feasors, or other multiple defendants who contributed to a single injurious act, could not be sued jointly because they resided in different districts.")

**27.** In fact, Wright, Miller and Cooper have characterized this ambiguity as "litigation-breeding." 15 Federal Practice and Procedure § 3806 at 45; *see also* Comment, *Federal Venue: Locating the Place Where the Claim Arose*, 54 Texas L.Rev. 392, 413 (1976).

were caused by the negligent design, manufacture, assembly, testing, service, inspection and maintenance of the airplane. Complaint at ¶ 12. Because the airplane was maintained in New Jersey, it is arguable that at least some significant portion of the negligent conduct—and, hence, Eason's claim—arose in New Jersey.

 Under the weight of contacts test, venue is proper in a district in which an act occurred that constituted a significant substantial element of the wrongdoing, but venue is not proper in a district where only insignificant or meaningless conduct had taken place. *Hodson*, 528 F.Supp. at 813 (citing *Philadelphia Housing Authority*, 291 F.Supp. at 260). This test, although also plagued by a certain degree of vagueness, affords a court the flexibility to find venue in a district which is convenient in terms of many factors: the subject matter of the cause of action, the location of witnesses and evidence, the interests of the defendants. *See Precision Rubber Products v. George McCarthy, Inc.*, 605 F.Supp. 473, 476 (M.D.Tenn.1984). In order to make a finding that the claim arose in the district where the contacts have been "most significant," a comparison of defendants' contacts in the various districts involved in the case is necessary. *Id.; Honda Associates, Inc.*, 374 F.Supp. at 891. Weighing these contacts, a court must consider "the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiffs)." *Leroy*, 443 U.S. at 186, 99 S.Ct. at 2718.

 Obviously, as the facts alleged by Eason in the complaint have not yet been proven, it is impossible to assess with any certainty the precise distribution of contacts.[28] However, because the airplane was owned and maintained by a New Jersey corporation and the gravamen of the complaint is faulty operation of the airplane's equipment and faulty maintenance of the airplane, it appears a substantial portion of the acts or omissions which gave rise to the plane crash occurred in New Jersey. Much of the physical evidence, witnesses and relevant documents likely to be needed at trial are present in New Jersey.

Examining the contacts between Eason's claim and this state, it appears that the claim, or some significant portion of it, arose in New Jersey. *Hodson*, 528 F.Supp. at 815. Although Kansas had an important contact with the claims set forth in Eason's complaint, this district is the one with the "most significant contact with the operative facts giving rise to plaintiff's claims." *Id.*

Beech has provided no compelling arguments to carry its burden of establishing that venue is improper. Accordingly, in view of the factors discussed above, its motion to dismiss for improper venue is denied.

### D. *Transfer*

 In the alternative, Beech seeks to transfer this action to Kansas pursuant to 28 U.S.C. § 1404(a). Section 1404(a) states: "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Although had venue not been proper with regard to Beech the claim against it could have been severed and transferred to the District of Kansas, litigation of related claims in the same tribunal is strongly favored because "it facilitates efficient, economical and expeditious pretrial proceedings and discovery and avoids duplicatous litigation and inconsistent results." *Woolridge v. Beech Aircraft Corp.*, 479 F.Supp. 1041, 1059 (W.D. Missouri 1979) (quoting *National Super Spuds, Inc. v. New York Mercantile Exch.*, 425 F.Supp. 665, 667 (S.D.N.Y.1977)). As the discussion in Section C of this opinion illustrates, New Jersey emerges as the most convenient forum

---

**28.** This is not fatal to concluding that the claim arose in New Jersey. *See* 15 Federal Practice & Procedure § 3806 at 68–71 ("It is important to bear in mind that precision is not required and the court need not identify that one district in which contacts weigh more heavily than in any others.")

for this action. Accordingly, because Beech has offered no argument supporting the conclusion that transfer pursuant to § 1404(a) would be for the convenience of the parties and witnesses and in the interest of justice, its motion to transfer is denied.

*Conclusion*

In conclusion, it appears that both the weight of the legal precedent and the equities of this case favor the maintenance of this case in the District of New Jersey. Although Beech intentionally structured its business activities to avoid being subject to the jurisdiction of states in which its products can be found, its contacts with New Jersey are sufficiently purposeful, continuous and substantive to render it subject to the State's jurisdiction. Venue in this district is also proper. Finally, Beech has not established that transfer pursuant to § 1404(a) is appropriate.

For these reasons, Beech's motions are denied.