**DATABASE AMERICA, INC. and Ed Burnette Consultants, Inc., Plaintiffs,**

v.

**BELLSOUTH ADVERTISING & PUBLISHING CORP., Defendant.**

Civ. A. No. 92–3610 (AJL).

United States District Court, D. New Jersey.

April 28, 1993.

---

Joseph B. Fiorenzo, Sokol, Behot & Fiorenzo, Hackensack, NJ, and Stanley L. Amberg, Robert E. Rudnick, Davis Hoxie Faithfull & Hapgood, New York City, for plaintiffs.

Roslyn S. Harrison, McCarter & English, Newark, NJ, and Anthony B. Askew, Jones & Askew, Atlanta, GA, for defendant.

OPINION ·

LECHNER, District Judge.

Currently before the court is the motion of defendant Bellsouth Advertising & Publishing Corp. ("BAPCO") to transfer the claims of plaintiffs Database America, Inc. ("Database") and Ed Burnette Consultants, Inc. ("Burnette") (collectively, the "Plaintiffs") to the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. §§ 1404(a) and 1406(a).[1] ·

For the reasons that follow, the motion is granted pursuant to 28 U.S.C. § 1406(a).[2]

*Facts*

Database and Burnette are related New Jersey corporations [3] with their principal and only places of business located in Montvale, New Jersey. Complaint (the "Complaint"), filed 26 Aug. 1992, ¶1; Goldner Decl., ¶2; Burnette Decl., ¶1. Since 1974, Burnette has been engaged in the business of preparing and selling lists. Complaint, ¶5; Opp. Brief at 2. These lists, which are prepared in Montvale with the aid of a computer database, contain factual information on businesses in the United States, such as names, addresses, telephone numbers and advertising data. Opp. Brief at 3. Plaintiffs concede that some of this factual information has been taken from yellow pages in directories published by BAPCO and by other, unrelated companies. Complaint, ¶5; Goldner Decl., ¶¶4, 10; Burnette Decl., ¶3. Neither Data-

base nor Burnette actually publish or has published its own yellow page directories. Opp. Brief at 3; Ambrosino Decl., ¶5.

BAPCO is a Georgia corporation with its principal place of business in Atlanta, Georgia.[4] Complaint, ¶2; Sgrosso Aff., ¶4. BAPCO has no office, telephone or bank account in New Jersey. Sgrosso Aff., ¶10; Moving Brief at 4. It does not maintain any sales, manufacturing or other type of office or employees in New Jersey. Sgrosso Aff., ¶¶10–11; Moving Brief at 4. BAPCO further alleges:

> BAPCO does not hold itself out to the public as doing business in New Jersey and has not qualified with the Secretary of State's office in New Jersey to do business within the state. BAPCO does not have a designated agent for the receipt of service of process in New Jersey and does not pay taxes in the state. BAPCO does not send any goods into New Jersey, nor does BAPCO perform any services within the state, including the sale of advertising for any of its [y]ellow [p]ages directories. Finally, BAPCO does not solicit sales of advertisements for its Yellow Pages directories outside the southeastern United States.

Moving Brief at 4 (citations omitted); *see also* Sgrosso Aff., ¶¶12–14.

Since 1984, BAPCO has been in the business of "creating, compiling, publishing and distributing classified telephone directories

---

1. In support of the motion to transfer, BAPCO has submitted the following: Defendant's Brief in Support of Motion to Transfer (the "Moving Brief"); Affidavit of W. Scott Petty (the "Petty Aff."); Affidavit of Vincent L. Sgrosso (the "Sgrosso Aff."); Affidavit of Kevin P. Dowling (the "Dowling Aff."); Affidavit of John E. Hudson (the "Hudson Aff."); Affidavit of Joseph S. Armanini; Defendant's Reply to Plaintiffs' Answering Brief on Defendant's Motion to Transfer Under 28 U.S.C. §§ 1404(a) and 1406(a) (the "Reply Brief"); Declaration of John F. O'Brien (the "O'Brien Decl."); Declaration of Rebecca S. Harris (the "Harris Decl.").

 In opposition to the motion, Plaintiffs have submitted the following: Plaintiffs' Answering Brief on Defendant's Motion to Transfer Under 28 U.S.C. §§ 1404(a) and 1406(a) (the "Opp. Brief"); Appendix to Plaintiffs' Answering Brief on Defendant's Motion to Transfer Under 28 U.S.C. §§ 1404(a) and 1406(a) (the "Opp. Brief App."); Declaration of Paul Goldner (the "Gold-

ner Decl."); Declaration of Ed Burnette (the "Burnette Decl."); Declaration of John Ripa (the "Ripa Decl."); Declaration of Paul Sobel (the "Sobel Decl."); Declaration of Allen Ambrosino (the "Ambrosino Decl."); Declaration of William E. Carroll (the "Carroll Decl."); Declaration of Leon J. Sokol (the "Sokol Decl.").

 Oral argument was heard on 22 February 1993.

2. Because transfer is appropriate pursuant to 28 U.S.C. § 1406(a), the arguments both in support of and in opposition to transfer pursuant to 28 U.S.C. § 1404(a) are not considered.

3. Burnette is a subsidiary of Database. Goldner Decl., ¶1; Burnette Decl., ¶1.

4. BAPCO is a wholly-owned subsidiary of Bellsouth Enterprises, Inc., which itself is a wholly-owned subsidiary of Bellsouth Corporation. Sgrosso Aff., ¶4.

(Yellow Pages) in nine southeastern states."[5] Moving Brief at 2; Sgrosso Aff., ¶ 6. Those states are Georgia, Florida, Tennessee, North Carolina, South Carolina, Alabama, Louisiana, Mississippi and Kentucky. Sgrosso Aff., ¶ 7; Dowling Aff., ¶ 18. BAPCO does not create, publish or distribute any yellow pages directories for use by telephone subscribers in New Jersey.[6] Sgrosso Aff., ¶ 9; Moving Brief at 4.

Annually, BAPCO publishes more than five hundred different telephone directories, including yellow pages.[7] Sgrosso Aff., ¶ 8; Moving Brief at 2–3. BAPCO asserts that, since 1984, it has protected its yellow pages directories from unauthorized use by copyrighting the directories. Moving Brief at 1, 3. BAPCO also sells advertising space and business listings in the yellow page directories which it publishes. Dowling Aff., ¶ 9; Moving Brief at 5; see infra at pp. 11–17 (discussing sales of advertising).

### A. The BAPCO/Burnette Relationship

It does not appear that BAPCO has ever entered into business transactions directly with Database. Moving Brief at 5; Hudson Aff., ¶ 9. As for business dealings with Burnette, BAPCO describes its relationship with Burnette as follows: "BAPCO entered into minor and infrequent business transactions with Burnette on a sporadic basis between 1984–88." Moving Brief at 4; see also Hudson Aff., ¶ 4. Specifically, BAPCO states:

BAPCO's business transactions were with Burnette as a broker of mailing lists and were primarily directed to the rental of mailing lists containing information derived from many sources, and related data

processing services. BAPCO utilized the mailing lists and data processing services supplied by Burnette to assist BAPCO's solicitation of businesses which might have had an interest in placing business information within the *Regional Industrial Pages* directories and to assist in determining which businesses should have received copies of the *Regional Industrial Pages* directories.

Hudson Aff., ¶ 5.

The business transactions between BAPCO and Burnette commenced in 1984 when Burnette sent an unsolicited marketing proposal to BAPCO. *See* Goldner Decl., ¶ 9, Burnette Decl., ¶ 8. In 1984, Burnette entered into an agreement with BAPCO to provide data for BAPCO's distribution of the Bellsouth Advertising Industrial Directory (the "BAPCO Industrial Directory")—a business-to-business directory—in Florida and in four Georgia counties. Goldner Decl., ¶ 10; Burnette Decl., ¶ 10; Hudson Aff., ¶ 6. To carry out this project, Burnette "gathered a series of lists, merged and unduplicated, and created a single, comprehensive distribution file." Goldner Decl., ¶ 10. In conversations among Ed Burnette ("Ed Burnette") and Paul Goldner ("Goldner"), both of Burnette, and John Mendoza ("Mendoza"), Manager of Direct Marketing for BAPCO,[8] Burnette alleges it disclosed that the data which it would use to compile its list for BAPCO would be yellow pages-based, including the use of BAPCO's own yellow pages.[9] Goldner Decl., ¶ 10; Burnette Decl., ¶ 10; Complaint, ¶ 8.

In 1985, Burnette and BAPCO entered into a second agreement for Burnette to

---

**5.** Prior to 1984, American Telephone & Telegraph Co. ("AT & T") published yellow pages for the geographic areas now covered by BAPCO. Complaint, ¶ 4. Now, BAPCO publishes its yellow pages pursuant to exclusive licensing agreements with Southern Bell Telephone and Telegraph Co. ("Southern Bell") and South Central Bell Telephone Co. ("South Central Bell"). Moving Brief at 2.

**6.** New Jersey is outside the subscriber area for telephone services provided by Southern Bell and South Central Bell. Moving Brief at 4.

**7.** According to Plaintiffs, the operations of Database and Burnette are small in comparison to BAPCO. In 1991, the combined sales of Data-

base and Burnette totalled less than twenty-one million dollars. Opp. Brief at 2; Ambrosino Decl., ¶ 3.

**8.** Mendoza was allegedly the primary BAPCO contact for Burnette. Goldner Decl., ¶¶ 7, 11.

**9.** Plaintiffs contend that AT & T, prior to BAPCO, was aware of Burnette's sales of lists containing yellow-page information and "never asserted that Burnette's activities were an infringement of any copyrights, or other rights, of AT & T." Complaint, ¶¶ 6–7.

provide BAPCO with a distribution file for the Bellsouth Industrial Directory covering North Carolina, South Carolina, Georgia and Florida. Opp. Brief at 9; Ambrosino Decl., ¶ 7. The distribution file, which was produced at Burnette's office in New Jersey, merged multiple lists into a single distribution list for BAPCO. Ambrosino Decl., ¶ 7. This particular distribution list allegedly merged two yellow page sources: National Business Lists ("NBL") and Burnette's Master File.[10] Ambrosino Decl., ¶ 7. In preparing this second list, Allen Ambrosino ("Ambrosino") and another Burnette employee visited Georgia in February 1986 to meet with BAPCO personnel. Ambrosino Decl., ¶ 8. Throughout this project, it is alleged Burnette informed BAPCO that the distribution list was completed using yellow pages-sourced databases. Ambrosino Decl., ¶ 9.

In 1986, BAPCO and Burnette entered into a third agreement for the formation of a distribution list for the BAPCO Industrial Directory. Opp. Brief at 9. According to Burnette, the 1986 project again used yellow pages-based data, including BAPCO's yellow pages, to fulfill this agreement. Opp. Brief at 9. It is alleged that, during this project, Goldner again told Mendoza that the file produced by Burnette for this project was yellow pages-based and included information from BAPCO's yellow pages.[11] Opp. Brief at 9. It is also alleged that, in addition to Mendoza, BAPCO employees Fred Monacelli ("Monacelli"), Bud Record ("Record") and Lee Harken were told of the yellow page-based sources for the 1985 and 1986 distribution lists. Ambrosino Decl., ¶ 9.

In 1987, BAPCO and Burnette entered into a fourth agreement to produce data for the BAPCO Industrial Directory. Opp. Brief at 9. At this time, John Ripa ("Ripa") of

Burnette assumed responsibility for the BAPCO account. Ambrosino Decl., ¶ 10. Similarly, John Hudson ("Hudson") of BAPCO was placed in charge of BAPCO's Industrial Directories and became Burnette's primary contact at BAPCO. Ambrosino Decl., ¶ 10. In a number of telephone conversations and correspondence, Ripa allegedly advised Hudson that the database used to produce the necessary data was yellow page-based.[12] Opp. Brief at 9. Plaintiffs also allege Hudson spent two days in Englewood, New Jersey in March, 1987, for the purpose of "going through, in great detail, with Mr. Ripa the contents, methods and procedures used to create the computer files from which the [BAPCO] Industrial Directory's data was provided to [BAPCO]." Opp. Brief at 9–10; Goldner Decl., ¶¶ 14–15; Ripa Decl., ¶¶ 4, 8; Ambrosino Decl., ¶ 17. These conversations, moreover, are alleged to have included "a full description of the business file and Yellow Page ingredient." Opp. Brief at 10; Ripa Decl., ¶¶ 4, 8–12.

Also in 1987, Plaintiffs worked on a number of additional projects with BAPCO. For instance, Goldner and Allen Ambrosino ("Ambrosino") of Burnette worked on a project with BAPCO personnel Mendoza, Record and Monacelli in which Burnette assisted BAPCO in assembling a centralized purchasing structure for all BAPCO subsidiaries. Opp. Brief at 10. Plaintiffs allege that, during this project, it was disclosed to BAPCO personnel by Ambrosino and Goldner that the Burnette database was derived from yellow pages, including the yellow pages of BAPCO. *Id.* According to Plaintiffs, these discussions occurred from November 1986 through early 1988.[13] *Id.* In addition, on 21 January 1987, Ripa and Ambrosino met in Georgia with Hudson and Ann McElroy of

---

**10.** Plaintiffs allege that, by virtue of *National Business Lists, Inc. v. Dun & Bradstreet, Inc.*, 552 F.Supp. 89, 98 (N.D.Ill.1982), "it was common knowledge throughout the industry that the National Business List was a yellow page-based list." Opp. Brief at 9; *see also* Burnette Decl., ¶¶ 5, 7; Ambrosino Decl., ¶ 9.

**11.** Plaintiffs do not contend BAPCO personnel entered New Jersey with relation to the first three agreements with Burnette. Opp. Brief at 9.

**12.** Plaintiffs state that this database has been maintained, stored and operated on computer tapes in New Jersey since its initial use in 1984. Goldner Decl., ¶ 6; Burnette Decl., ¶ 3. Yellow pages information, however, is not the sole source of all information in this database. Goldner Decl., ¶ 6; Burnette Decl., ¶ 3.

**13.** It is not contended the BAPCO personnel ever appeared in New Jersey with regard to this project. Opp. Brief at 10.

BAPCO to review two projects for BAPCO's Gulf Coast and Mid–Atlantic directories. Ripa Decl., ¶ 5; Ambrosino Decl., ¶ 12. The fact of yellow pages-based data was allegedly discussed at this meeting as well. Ripa Decl., ¶ 6; Ambrosino Decl., ¶ 13.

On 12 February 1988, Hudson of BAPCO is alleged to have again met Burnette personnel in Englewood, New Jersey. Opp. Brief at 10; Ripa Decl., ¶ 16; Ambrosino Decl., ¶ 18. This visit lasted two days and was allegedly arranged so that Hudson could review previous projects and a plan for a new distribution of the BAPCO Industrial Directory in the Pacific Northwest. Ripa Decl., ¶ 16; Ambrosino Decl., ¶ 18. It is alleged that, during this meeting, "the data requested by [BAPCO] for distribution of its Industrial Pages would again come from the Database file which was derived from [y]ellow [p]age[s] data, including [BAPCO y]ellow [p]age[s] data." Opp. Brief at 10. The project was completed in March 1988. Ripa Decl., ¶ 16. BAPCO has not published or distributed its Industrial Directories since May 1988. Hudson Aff., ¶ 6.

In acknowledging these dealings with Burnette, BAPCO downplays their significance, as well as the relationship between the services for which it hired Burnette and its yellow pages as follows:

> For a typical transaction, BAPCO sent a purchase order from Atlanta to Burnette in New Jersey and, in response, Burnette performed list-related services in that state and shipped to BAPCO in Atlanta lists of businesses to be solicited and mailing labels for businesses which should receive a copy of the [BAPCO] Industrial Pages [D]irectories. The [BAPCO] Industrial Pages [D]irectories were not associated with nor related to BAPCO's copyrighted yellow pages.

Moving Brief at 5 (citations omitted); see also Hudson Aff., ¶ 7.

Burnette alleges that, although BAPCO has ceased publishing the BAPCO Industrial Directory, its business dealings with BAPCO have continued. Burnette vaguely states:

The relationship between [BAPCO] and [Burnette] continued in two areas:

a. Filling various list orders placed by John Mendoza and others from [BAPCO through 1991] ...

b. Continuing discussions relating to management of [BAPCO]'s telephone subscriber data.[14]

Goldner Decl., ¶ 16; see also Ripa Decl., ¶ 17; Ambrosino Decl., ¶ 19. Burnette indicates that its "most recent contact" with BAPCO was with BAPCO employee Lane McRae ("McRae"). Sobel Decl., ¶ 2; Ambrosino Decl., ¶ 20. According to Burnette, in January 1992, McRae visited its offices in New Jersey "in reference to acquiring data from [Burnette] for the purpose of introducing an electronic yellow pages." Sobel Decl., ¶ 2; Ambrosino Decl., ¶ 20. Burnette speculates McRae "would not have sought [its] services had she not already known [Burnette] compiled yellow pages." Sobel Decl., ¶ 4; see also Opp. Brief at 11.

### B. Other Alleged Business Conducted by BAPCO in New Jersey

As mentioned, BAPCO accepts local and nationwide advertising for its yellow pages. This occurs through two channels. Dowling Aff., ¶ 9. Local advertisers—those within the nine southeastern states in which BAPCO distributes its yellow pages—purchase advertising directly from BAPCO or from its outside vendor. Dowling Aff., ¶ 9; Moving Brief at 5. In contrast, BAPCO "does not solicit sales of advertisements in BAPCO's directories from advertisers located outside the southeastern United States." Dowling Aff., ¶ 18. National advertisers—those outside the BAPCO distribution area—purchase advertising space from Certified Marketing Representatives (the "CMRs"). Dowling Aff., ¶ 9; Moving Brief at 5.

Although BAPCO states it "has never contacted an advertiser in New Jersey to solicit advertisements," id., seven CMRs which deal with BAPCO have headquarters in New Jer-

---

14. As with their initial contact, it appears Burnette sent proposals to BAPCO regarding this area of business, rather than BAPCO soliciting Burnette's assistance. See, e.g., Ambrosino Decl., ¶ 19; Ripa Decl., Ex. 3; Goldner Decl., Ex. 2.

sey.[15] Like all CMRs which do business with BAPCO, the New Jersey CMRs have standard written contracts with BAPCO to publish national advertising in its yellow pages directories (the "CMR Agreements").[16] Moving Brief at 5–6; *see also* Opp. Brief App. at A146–52 (sample CMR Agreements); Petty Aff., Ex. F (same).

BAPCO has accepted advertising for placement in its yellow pages from CMRs since 1 January 1984.[17] Moving Brief at 5–6. The sales activities of CMRs generate revenue for BAPCO.[18] Nevertheless, BAPCO asserts it does not control the day-to-day operations of any CMR, nor are any of the persons who work for CMRs employees or agents of BAPCO.[19] Dowling Aff., ¶¶ 14, 20; Moving Brief at 6. According to BAPCO:

CMRs operate completely independent of BAPCO and work directly with national advertisers to determine which directories throughout the United States are available for the placement of national advertising. CMRs represent the national advertisers by placing orders for national advertising

with various publishers through a nationwide electronic network that connects CMRs to publishers.

Moving Brief at 5. Moreover, the CMR Agreements specifically state that a CMR "is an independent contractor and not an employee, agent, partner or joint venturer of or with [BAPCO]. Moving Brief at 6–7; Petty Aff., Ex. F, ¶ 19.

Paragraph One of the CMR Agreements provides:

Subject to the terms and conditions specified hereinafter, [BAPCO] agrees to accept and publish yellow page listings and display advertising ... timely submitted by [CMRs], in return for which [BAPCO] agrees that its charges for publishing [ads] submitted by [CMRs] shall be subject to a twenty-two [percent] selling commission to be deducted from [BAPCO]'s invoice....

Petty Aff., Ex. F, ¶ 1. Although BAPCO appears to publish only those orders that meet its specifications, BAPCO publishes all listings and advertising submitted by CMRs

**15.** These seven CMRs are: Advanced Directory Sales, Inc.; Directory Advertising Consultants, Inc.; Directory Advisors, Inc.; LBC Communications, Inc.; National Advertising Placement Service Corp.; National Telephone Directory Corp.; and Yellow Page Consultants, Inc. Moving Brief at 6 n. 2.

**16.** Plaintiffs argue fourteen CMRs with which BAPCO deals, as opposed to seven, are located in New Jersey. Opp. Brief at 11.

**17.** Publishers of yellow page directories (such as BAPCO), as well as organizations that solicit and sell national advertising for placement in yellow pages (such as CMRs), are members of a nonprofit organization known as the "Yellow Pages Publishers Association") (the "YPPA"). Dowling Aff., ¶ 5; Moving Brief at 6. To obtain their certified status, CMRs must satisfy certain minimum requirements established by the YPPA. Dowling Aff., ¶ 6; Moving Brief at 6. The YPPA handles all certification procedures for CMRs and operates services to facilitate the placement of national advertising by CMRs in yellow pages published by YPPA publisher members. Moving Brief at 6. BAPCO and other publishers of yellow pages also distribute guidelines and specifications—such as advertising border size, illustrations, slogans, and heading choices that are available for advertisements in publisher's directories—to the YPPA for use by CMRs. *Id.;* Dowling Aff., ¶¶ 22–23.

**18.** According to Plaintiffs, the gross dollar amount of yellow page listings and advertising

sold by BAPCO through CMRs in New Jersey, for the years 1990 through 1992 (partial), was as follows: $4,021,512.76 (1990); $4,812,447.49 (1991); and $3,607,014.08 (1992 partial). Opp. Brief at 11; Carroll Decl., ¶ 6. After deducting a twenty-two percent commission paid to CMRs, Plaintiffs allege the net dollar amount of yellow page listings and advertising sold by BAPCO through CMRs in New Jersey, for the years 1990 through 1992 (partial), was as follows: $3,136,779.95 (1990); $3,753,709.04 (1991); and $2,813,470.98 (1992 partial). Opp. Brief at 13; Carroll Decl., ¶ 5.

Although BAPCO does not cite specific figures, it asserts that the "[n]ational advertising placed by New Jersey-based ... CMRs represents only a small portion of *all* national advertising published in BAPCO's [y]ellow [p]ages directories." O'Brien Decl., ¶ 10 (emphasis in original). Moreover, "[n]ational advertising published in BAPCO's [y]ellow [p]ages directories represents only a small portion of the total advertising ... published in those directories." *Id.,* ¶ 11.

**19.** BAPCO adds that it "does not have access to the corporate financial records of any CMR except to the extent necessary to determine the credit worthiness of a CMR" and that "BAPCO does not participate in the corporate decisions of any CMRs or share in any revenues earned by CMRs." Moving Brief at 7; *see also* Dowling Aff., ¶¶ 14, 16–17.

which meet those specifications. Moving Brief at 6; Opp. Brief App. at A122 (Deposition Transcript of Kevin P. Dowling, dated 18 November 1992 (the "Dowling Dep. Tr.")).

No CMR has a contract with BAPCO to solicit and place national advertising exclusively in BAPCO's yellow pages directories. Dowling Aff., ¶ 15; Moving Brief at 7. Instead, CMRs contact advertisers independently from BAPCO concerning the placement of national advertising with various YPPA publishers. Moving Brief at 7. As BAPCO further states:

> CMRs typically represent many different advertisers and send order requests for national advertising to a number of publishers, including publishers other than BAPCO. CMRs are free to work with any national advertiser to develop advertisements that meet BAPCO's advertising specifications for publication in BAPCO's yellow page directories.

Moving Brief at 7; Dowling Aff., ¶ 24.

BAPCO does not directly or indirectly communicate with national advertisers. Moving Brief at 7; Dowling Aff., ¶¶ 18, 33. All such communication is conducted by CMRs. Moving Brief at 7; Dowling Aff., ¶¶ 27–30. BAPCO is not, in any way, involved in the creation, design or production of advertisements. Dowling Aff., ¶¶ 27–28. In addition, CMRs control the issuance of bills to national advertisers for publication in BAPCO's yellow pages. Moving Brief at 7; Dowling Aff., ¶ 37.

In response to an order for advertising from a CMR,[20] BAPCO directly invoices the CMR for placement of that advertisement in BAPCO's yellow pages and the CMR—not the advertiser—is responsible for payment of the invoice to BAPCO. Dowling Aff., ¶ 42; Moving Brief at 7. CMRs, furthermore, "independently control the advertisement rate charged each advertiser and may charge more or less than the full standard advertisement value." Moving Brief at 8; Dowling Aff., ¶¶ 40–41. BAPCO does not compensate CMRs for the placement of national advertisement in BAPCO's yellow pages directories, although it does charge CMRs a discounted rate. Dowling Aff., ¶ 38; Moving Brief at 8.

In addition to meeting BAPCO's specifications, CMRs are required to adhere to all of BAPCO's "practices, standards [and] ethical requirements." Id. at A146–52 (CMR Agreements, ¶ 5). However, when a difference arises between an advertiser and BAPCO, the CMR represents the advertiser's interest.[21] Dowling Aff., ¶ 46. If a CMR fails to comply with its obligations and responsibilities under the CMR Agreements, BAPCO may cancel all advertising submitted by the CMR and deal directly with the advertiser for the placement of advertising within BAPCO's yellow pages directories. Id. at A150–51 (CMR Agreement, ¶ 15). On one occasion, BAPCO apparently informed a noncompliant CMR that it intended to deal directly with an advertiser. Id. at A142–43 (Dowling Dep. Tr. at 119–20). It does not appear, however, that any direct dealing between BAPCO and a national advertiser has ever actually occurred. Id.

Commencing in March 1990, BAPCO initiated a liaison program (the "BAPCO Liaison Program") to explain its product line to CMRs. Id. at A128–29, A138–39 (Dowling Dep. Tr. at 56–57, 79–80). BAPCO maintains five employees in the BAPCO Liaison

---

**20.** The YPPA operates the Value Added Network (the "VAN Network"), a nationwide electronic network that connects publishers and CMRs. Dowling Aff., ¶ 12; Moving Brief at 6. CMRs use the VAN Network to send order requests for national advertising to the directory publishers selected by the advertiser and the CMR. Dowling Aff., ¶¶ 12, 34; Moving Brief at 6.

**21.** This provision was also part of the YPPA Bylaws and Guidelines (the "YPPA Bylaws") which, in addition to the CMR Agreements, control the relationship between BAPCO and the CMRs. See Moving Brief at 8; Petty Aff., Ex. G (copy of YPPA Bylaws). Until November 1992,

this provision provided that CMRs represented the interests of the publisher rather than the advertiser. Moving Brief at 8; Dowling Aff., ¶ 48; According to BAPCO the section was amended to reflect actual practice. BAPCO asserts that, "in actual practice, CMRs have not represented the publisher in such disputes with an advertiser." Moving Brief at 8; Dowling Aff., ¶ 47. Instead, according to BAPCO, "CMRs [have] represent[ed] the interests of advertisers and generally act a mediator in an effort to resolve those disputes." Moving Brief at 8; Dowling Aff., ¶ 47.

Program. Moving Brief at 8. Pursuant to the BAPCO Liaison Program, employees of BAPCO made visits to CMRs in New Jersey in 1992.[22] Opp. Brief at 16; Moving Brief at 8. These visits appear to have occurred in April and June 1992 and lasted less than one day. *See* Opp. Brief at 16–17. The purpose of these visits was allegedly to conduct training presentations and review existing agreements with those CMRs. *Id.* at 17; Opp. Brief App. at A198.

Also pursuant to the BAPCO Liaison Program, it is contended BAPCO has sent company literature to CMRs, including: (1) materials concerning the announcement and description of new BAPCO products or modifications to existing products, *see* Opp. Brief App. at A134–35 (Dowling Dep. Tr. at 69–70), (2) survey questionnaire report cards, *see id.* at A200–01, (3) general correspondence via Electronic Mail, *see id.* at A133 (Dowling Dep. Tr. at 68), (4) copies of BAPCO's Yellow Pages Advertisement Specifications and Standards Guidelines which set out the requirements of advertisements BAPCO would accept, *see id.* at A136–37 (Dowling Dep. Tr. at 72–73), A202–04, and (5) tear sheets, each consisting of the advertisement, proof of publication and billing document in response to orders received from the BAPCO Authorized Representatives, *see id.* at A121 (Dowling Dep. Tr. at 23).

In addition to BAPCO's business with CMRs, from 1988 to the present, BAPCO has been using a database management software product known as the "Listing Services System—Directory Project" (the "LSS System"). Opp. Brief at 17. The LSS System was developed by and purchased from Bell Communications Research ("Bellcore") in Piscataway, New Jersey. *Id.* at 17–18; *see also* Opp. Brief App. at A205–40. The LSS System is a computer database used by BAPCO to publish its customer white pages. Harris Decl., ¶ 3. The LSS System is not, in any way, related to BAPCO's production of yellow pages. *Id.*

It is contended that, all totalled, BAPCO paid Bellcore $2,679,300 in 1989 and $2,295,900 in 1990 for LSS System services. Opp. Brief at 18; Opp. Brief App. at A249–51. Although Burnette concedes BAPCO "did not open a bank account in New Jersey to pay for these products and services," Burnette argues BAPCO "maintained the equivalent of a bank account in the form of a Client Retainer Fund Account at Bellcore in New Jersey." Opp. Brief at 18. This retainer fund was allegedly used by BAPCO to pay for its purchase of services and products from Bellcore. *Id.;* Opp. Brief App. at A252–54.

According to Burnette, BAPCO maintains "a Systems Design and Implementation division in which its employees manage the operation of its LSS [S]ystem." Opp. Brief at 18. Employees in this division allegedly "engage in continuous communication with Bellcore in New Jersey via telephone, letter and in person concerning the function of the LSS software, future software releases, improvements, updates and design specifications of future enhancements to be developed by Bellcore." *Id.* at 18–19. BAPCO disputes this contention of continuous interaction with Bellcore, indicating that only nineteen pieces of written correspondence were sent by BAPCO to Bellcore in the years 1988 to 1991. Reply Brief at 14.

It is also alleged by Plaintiffs that BAPCO employees, on one occasion, visited Bellcore in New Jersey "to discuss implementations and improvements to the LSS [S]ystem." Opp. Brief at 18; *see also* Opp. Brief App. at A246–48. Finally, it is alleged BAPCO assisted in funding and development of software enhancements to the LSS System, the work for which was done in New Jersey. Opp. Brief at 19; Opp. Brief App. at A274–331. According to BAPCO, since 1988 "the only services that Bellcore has provided to BAPCO ... only include providing routine upgrading of the existing LSS software system," Harris Decl., ¶ 3. Although offered numerous enhancements to the LSS System,

---

**22.** The parties dispute the number of these visits. According to BAPCO, only two visits to two CMRs have been made to New Jersey pursuant to the BAPCO Liaison Program. Moving Brief at

**8.** According to Burnette, BAPCO employees have made six visits to five CMRs. Opp Brief at 16.

BAPCO has not incorporated those enhancements into the system. *Id.*

### C. *Events Leading to This Litigation*

On 20 July 1992, BAPCO sent a letter (the "Cease and Desist Letter") to Database. Opp. Brief at 3; *see also* Complaint, Ex. A (copy of Cease and Desist Letter). According to BAPCO, the Cease and Desist Letter was prompted when, in early 1992, BAPCO received a Database Quarterly Report stating that Database "had just completed compiling the [Database] Yellow Pages File from over 4,200 [y]ellow [p]ages directories." Moving Brief at 3.

The Cease and Desist Letter asserted that Database was violating copyright law by using BAPCO's yellow pages to compile its lists and insisted that Database "immediately cease and desist from this type of activity." Opp. Brief at 3. The Cease and Desist Letter also asserted that BAPCO's decision was supported by the Eleventh Circuit's ruling in *Bellsouth Advertising and Publishing Corp. v. Donnelley Information Publishing, Inc.*, 933 F.2d 952 (11th Cir.1991).[23] According to Plaintiffs, prior to the Cease and Desist Letter, BAPCO never asserted Plaintiff's activities were an infringement of any copyrights. Complaint, ¶ 9.

On 26 August 1992, rather than respond to the Cease and Desist Letter, Plaintiffs filed the Complaint, seeking a declaratory judgment under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, that, *inter alia*, (1) Plaintiffs have not infringed on any copyright or other right of BAPCO "by reason of Plaintiffs' preparation and sale of lists containing information taken from the yellow pages in the directories published by BAPCO" and (2)

Plaintiffs' presentation and sale of their lists constitute a fair use of the information claimed by BAPCO to be copyrighted. Complaint at 5. Plaintiffs allege, *inter alia*, that BAPCO does not possess any valid copyright to the information which Plaintiffs extract from BAPCO's yellow pages and include in their lists. Complaint, ¶¶ 19–25.

According to Plaintiffs, the lawsuit was brought

> [b]ecause the [Cease and Desist L]etter failed to state any willingness to negotiate with Database ... and, instead, insisted that Database ... "immediately cease and desist" from preparing its lists....

Opp. Brief at 4. Moreover, Plaintiffs argue:

> [The Cease and Desist Letter] presented our companies with an unreasonable risk in the absence of a quick and decisive decision as to our rights. The threat casts a shadow over all that these companies do until our rights are resolved. It impedes planning capabilities in the area of marketing, technological investment, expansion, personnel hiring and others.... It is imperative to the well-being, even survival of these companies that a quick decision be rendered in this case.

Goldner Decl., ¶ 3; *see also* Sokol Decl., ¶ 6.

### *Discussion*

#### A. *Venue Under 28 U.S.C. § 1391(b)*

■ Pursuant to 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interests of justice, transfer such case to any district or division in which it could have been brought." *Id.* A district court may transfer a case under Section 1406(a) regard-

---

23. On 4 November 1992, the Eleventh Circuit granted a rehearing *en banc* and vacated the decision in *Donnelley. See Bellsouth Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc.*, 977 F.2d 1435 (11th Cir.1992); *see also* Sokol Decl., Ex. 1(b) (copy of order granting rehearing *en banc*). In the meantime, three copyright cases brought by BAPCO—*BellSouth Advertising and Publishing Corp. v. American Business Lists, Inc.*, No. 1:90–CV–149–JEC, 1992 WL 338392 (N.D.Ga.), *BellSouth Advertising and Publishing Corp. v. EKI, Inc.*, No. 1:90–CV–971–JEC (N.D.Ga.) and *BellSouth Advertising and*

*Publishing Corp. v. Dunn & Bradstreet Information Servs.*, No. 1:92–CV–2430–JEC (N.D.Ga.) (collectively, the "Georgia Actions")—were stayed in December 1992 pending the *en banc* decision by the Eleventh Circuit in *Donnelley.* Opp. Brief at 5; Sokol Decl., ¶¶ 2–3, Exs. 1(c)-(e) (copies of stay orders in Georgia Actions). All of these cases have been assigned to Judge Julie E. Carnes of the Northern District of Georgia. Opp. Brief at 5; *see also* Sokol Decl., Exs. 1(c)-(e). Although these actions involve copyright issues regarding BAPCO's yellow pages similar to this case, they have no direct nexus with this action.

less of whether personal jurisdiction exists over the defendants. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 465–66, 82 S.Ct. 913, 915–16, 8 L.Ed.2d 39 (1962); *see also Carteret Sav. Bank, FA v. Shushan,* 919 F.2d 225, 231 (3d Cir.1990); *United States v. Berkowitz,* 328 F.2d 358, 361 (3d Cir.), *cert. denied,* 379 U.S. 821, 85 S.Ct. 42, 13 L.Ed.2d 32 (1964).

■ Jurisdiction in the present case is premised on 28 U.S.C. §§ 1331, 1338 and 2201–02. Accordingly, proper venue in this case is controlled by 28 U.S.C. § 1391(b).[24] Section 1391(b) provides in pertinent part:

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may ... be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ... or (3) a judicial district in which any defendant may be found, if there is no judicial district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In addition, Section 1391(c) provides that "[f]or the purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." 28 U.S.C. § 1391(c).

BAPCO argues venue in the District of New Jersey is improper because neither general nor specific personal jurisdiction can be asserted over BAPCO in this district. Moving Brief at 11, 25. Plaintiffs counter by arguing that (1) both general and specific personal jurisdiction exists over BAPCO in New Jersey and (2) New Jersey constitutes the state in which "a substantial part of the events ... giving rise to the claim occurred," making venue proper under both 28 U.S.C. § 1391(b)(1) & (b)(2). Opp. Brief at 25–27.

B. *Venue Pursuant to 28 U.S.C. § 1391(b)(1): Personal Jurisdiction Over BAPCO in New Jersey*

■ A Federal court has jurisdiction over a non-resident defendant to the extent authorized by the law of the state in which that court sits. Fed.R.Civ.P. 4(e); *North Penn Gas Co. v. Corning Natural Gas Corp.,* 897 F.2d 687, 689 (3d Cir.), *cert. denied,* 498 U.S. 847, 111 S.Ct. 133, 112 L.Ed.2d 101 (1990); *Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 436 (3d Cir.1987); *American Tel. & Tel. Co. v. MCI Communications Corp.,* 736 F.Supp. 1294, 1301 (D.N.J.1990) (hereinafter *"AT & T"*). Federal courts sitting in New Jersey apply New Jersey law when interpreting the meaning of due process for the purpose of *in personam* jurisdiction. *AT & T,* 736 F.Supp. at 1301; *Eason v. Linden Avionics, Inc.,* 706 F.Supp. 311, 319 (D.N.J.1989); *Western Union Telegraph v. T.S.I., Ltd.,* 545 F.Supp. 329, 332 (D.N.J.1982).

■ The New Jersey Long Arm Rule permits the assertion of *in personam* jurisdiction as far as is constitutionally permissible under the Fourteenth Amendment. N.J.Ct.R. 4:4–4; *De James v. Magnificence Carriers, Inc.,* 654 F.2d 280, 284 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981); *Apollo Technologies Corp. v. Centrosphere Industrial Corp.,* 805 F.Supp. 1157, 1181 (D.N.J.1992); *Charles Gendler & Co. v. Telecom Equip. Corp.,* 102 N.J. 460, 469, 508 A.2d 1127 (1986) (citing *Avdel Corp. v. Mecure,* 58 N.J. 264, 268, 277 A.2d 207 (1971)). Under the Fourteenth Amendment, personal jurisdiction exists where the plaintiff demonstrates the defendant has sufficient "minimum contacts" with the forum state:

> The first step in a minimum contacts analysis ... is to determine whether the defendant has sufficient contacts with the forum state. The second step is to evaluate those contacts "in light of other factors to deter-

---

24. Venue in a declaratory judgment action for patent or copyright infringement is governed by the general venue statute at 28 U.S.C. § 1391(b), rather than by the specific venue statute for infringement actions at 28 U.S.C. § 1400(b). *Millipore Corp. v. University Patents, Inc.,* 682 F.Supp. 227, 234 (D.Del.1987); *Pennwalt Corp. v.*

*Horton Co.,* 582 F.Supp. 438, 440 (E.D.Pa.1984); *Dicar, Inc. v. L.E. Sauer Mach. Co.,* 530 F.Supp. 1083, 1088 (D.N.J.1982); *see also Gesco Int'l, Inc. v. Luther Medical Prods., Inc.,* 17 U.S.P.Q.2d (BNA) 1168, 1169 (W.D.Tex.1990) (citing additional cases).

mine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice."

*Charles Gendler & Co.*, 102 N.J. at 472, 508 A.2d 1127 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985)); *see also Lebel v. Everglades Marina, Inc.*, 115 N.J. 317, 322, 558 A.2d 1252 (1989); *Ruetgers–Nease Chem. Co. v. Firemen's Ins. of Newark*, 236 N.J.Super 473, 477, 566 A.2d 227 (App.Div. 1989). The courts of New Jersey have exercised *in personam* jurisdiction "wherever possible with a liberal and indulgent view if the facts reasonably support the presence of the flexible concepts of 'fair play and substantial justice.'" *Ketcham v. Charles R. Lister Int'l, Inc.*, 167 N.J.Super. 5, 7, 400 A.2d 487 (App.Div.1979); *J.I. Kislak, Inc. v. Trumbull Shopping Park, Inc.*, 150 N.J.Super 96, 98, 374 A.2d 1246 (App.Div.1977).

■ Because a jurisdictional defense has been raised, Plaintiffs bear the burden of demonstrating that BAPCO's contacts with New Jersey are sufficient to give the court *in personam* jurisdiction. *North Penn Gas*, 897 F.2d at 690; *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 542 (3d Cir. 1985); *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir.1983). "The plaintiff must sustain its burden of proof through 'sworn affidavits or other competent evidence.'" *North Penn Gas*, 897 F.2d at 689 (quoting *Stranahan Gear Co. v. NL Indust.*, 800 F.2d 53, 58 (3d Cir.1986)).

■ Plaintiffs must demonstrate that either specific or general jurisdiction exists over BAPCO. *Provident Nat'l Bank*, 819 F.2d at 437; *Apollo*, 805 F.Supp. at 1182; *Giangola v. Walt Disney World Co.*, 753 F.Supp. 148, 154 (D.N.J.1990). For purposes of establishing either specific or general jurisdiction, minimum contacts with a state are shaped by purposeful conduct making it reasonable for the defendant to anticipate being haled into court there. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958); *North Penn Gas*, 897 F.2d at 690; *Lebel*, 115 N.J. at 323, 558 A.2d 1252. These contacts must have a basis in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws." *Hanson*, 357 U.S. at 253, 78 S.Ct. at 1240; *accord Lebel*, 115 N.J. at 323–24, 558 A.2d 1252. The absence of a "physical presence" in the state is not determinative for jurisdictional purposes. *Burnham v. Superior Court*, 495 U.S. 604, 618, 110 S.Ct. 2105, 2114, 109 L.Ed.2d 631 (1990) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)); *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184; *Charles Gendler*, 102 N.J. at 469–70, 508 A.2d 1127 (same).

■ In measuring the sufficiency of minimum contacts for *in personam* jurisdiction, a court must focus upon the "relationship among the defendant, the forum and the litigation."[25] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977)); *Giangola*, 753 F.Supp. at 155. The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another person.'" *Burger King*, 471 U.S. at 475, 105 S.Ct. at 2183 (citations omitted); *accord Giangola*, 753 F.Supp. at 155; *AT & T*, 736 F.Supp. at 1302–03; *Lebel*, 115 N.J. at 323, 558 A.2d 1252.

---

25. In establishing specific jurisdiction, for instance, an isolated but significant act may be sufficient to subject the defendant to the jurisdiction of the forum. *Charles Gendler*, 102 N.J. at 471, 508 A.2d 1127 (citing *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)); *see also De James*, 654 F.2d at 286; *Western Union*, 545 F.Supp. at 333; *Bovino v. Brumbaugh*, 221 N.J.Super. 432, 435–36, 534 A.2d 1032 (App.Div.1987); *Dave's Trash Removal v. Charm City Equip. Corp.*, 214 N.J.Super. 497, 501, 520 A.2d 415 (App.Div. 1987).

*Burger King* indicates when jurisdiction based upon "purposeful availment" is proper:

Jurisdiction is proper .... where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum state. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation on that forum as well.

*Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84 (citations omitted) (emphasis in original); *accord North Penn Gas,* 897 F.2d at 690; *see also Hanson,* 357 U.S. at 253, 78 S.Ct. at 1239–40 (by exercising privilege of conducting activities within forum state, defendant is put on "clear notice" that it is subject to suit there); *Eason,* 706 F.Supp. at 320 (fairness of exercising jurisdiction results from reciprocal relationship between defendant and forum state).

### 1. General Jurisdiction

 General jurisdiction exists where the defendant has continuous and systematic contacts with the state which are unrelated to the subject matter of the lawsuit. *Provident Nat'l Bank,* 819 F.2d at 437 (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 1872–73, 80 L.Ed.2d 404 (1984)); *see also North Penn Gas,* 897 F.2d at 690 n. 2; *Apollo,* 805 F.Supp. at 1182. General jurisdiction requires a plaintiff to show significantly more than mere minimum contacts. *Provident Nat'l Bank,* 819 F.2d at 437 ("contacts to forum must be continuous and substantial"); *see also North Penn Gas,* 897 F.2d at 690 n. 2 (same); *Gehling,* 773 F.2d at 541 (same); *Dollar Sav. Bank v. First Secur. Bank, N.A.,* 746 F.2d 208, 212 (3d Cir.1984); *Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas,* 675 F.2d 587, 589 (3d Cir.1982).

 Plaintiffs have not established that BAPCO maintains continuous and substantial contacts such that BAPCO is subject to general *in personam* jurisdiction in New Jersey. BAPCO is a Georgia corporation with its principal place of business in Atlanta, Georgia. Complaint, ¶ 2; Sgrosso Aff., ¶ 4. BAPCO has no office, telephone or bank account in New Jersey. Sgrosso Aff., ¶ 10; Moving Brief at 4. Nor does it maintain any sales, manufacturing or other type of office or employees in New Jersey. Sgrosso Aff., ¶¶ 10–11; Moving Brief at 4.

BAPCO does not hold itself out to the public as doing business in New Jersey and is not qualified with the Secretary of State's office in New Jersey to do business within the state. Sgrosso Aff., ¶¶ 12–14. BAPCO does not have a designated agent for the receipt of service of process in New Jersey and does not pay taxes in the state. *Id.* BAPCO does not send any goods into New Jersey, nor does BAPCO perform any services within the state. *Id.* Significantly, BAPCO does not publish or distribute its yellow page directories or *any* of its five hundred directories in New Jersey. *Id.* BAPCO does not solicit New Jersey advertisers. Dowling Aff., ¶ 18.

Plaintiffs make numerous arguments to support their claim that BAPCO is subject to general personal jurisdiction in New Jersey, none of which are substantive. First, Plaintiffs argue that BAPCO "has conducted and continues to conduct substantial, continuous and purposeful business activity in this district with the 14 [CMRs] who have their headquarters or branch offices in New Jersey." Opp. Brief at 36. These contacts, however, are insufficient to establish general jurisdiction over BAPCO.

As mentioned, BAPCO does not solicit advertising in New Jersey, either directly or indirectly, through the CMRs. Dowling Aff., ¶ 18. While it accepts advertising from the CMRs and, indeed, profits from that advertising, BAPCO neither initiates contact with the CMRs nor injects its presence into New Jersey for the purpose of dealing with the CMRs. Put simply, the CMRs are independent businesses. BAPCO has no control over their day-to-day operations, does not participate in CMR corporate decisions, and does not share either employees or revenue

with any CMR. *See* Dowling Aff., ¶¶ 14, 16–17, 20; Petty Aff., Ex. F, ¶ 19.

BAPCO has no control over the advertising solicitation or submission process. BAPCO has no direct contact with advertisers. Dowling Aff., ¶¶ 18, 33. BAPCO does not have a contract with any CMR to solicit and place national advertising exclusively in BAPCO's yellow pages. Dowling Aff., ¶ 15. Significantly, it is the CMR which initiates contact with BAPCO and proposes advertisements. When a CMR begins to work with a national advertiser, it is the CMR and the advertiser which (1) decide in which yellow pages to publish the advertisement, (2) create and design the advertisement and (3) produce the actual advertisement subject to the published specifications of BAPCO. *Id.,* ¶¶ 27–28. It is also the CMR which (1) contacts BAPCO, (2) submits an order for the advertisement via the VAN Network, (3) submits the advertisement for BAPCO's approval and (4) invoices the advertiser. *Id.,* ¶¶ 12, 34, 37, 40–41. In short, if BAPCO has any presence in New Jersey, it is the CMRs which draw BAPCO into the state, rather than any purposeful injection by BAPCO of its presence.

This case is conceptually indistinguishable from *Gehling v. St. George's School of Medicine, Ltd.,* in which the Third Circuit determined that general jurisdiction was lacking over an out-of-state defendant. In *Gehling,* St. George's medical school in Grenada, West Indies placed advertisements in the *New York Times* and *Wall Street Journal* which were read by potential applicants in Pennsylvania. 773 F.2d at 541. In addition, officials of St. George's toured Pennsylvania to gain exposure for the school, although no direct attempts to recruit students occurred during that tour. *Id.* at 541–42. Finally, St. George's maintained a joint international program with Pennsylvania-based Waynesburg College ("Waynesburg"), in which Waynesburg would provide two years of pre-medical training to students who would then complete their medical studies in Grenada. *Id.* at 542. Representatives of St. George's twice travelled to Pennsylvania to establish the joint program. *Id.*

Despite these contacts, and despite the facts that Pennsylvania residents composed six percent of St. George's student body and that St. George's annually received several hundred thousand dollars in tuition from those Pennsylvania residents, the Circuit concluded general jurisdiction did not exist over St. George's in Pennsylvania. The *Gehling* court stated:

[T]he fact that some of St. George's students are residents does not signify a relevant business contact. Advanced educational institutions typically draw their student body from numerous states, and appellant's theory would subject them to suit on non-forum claims in every state where a member of the student body resides. Thus, the fact that residents of the state apply and are accepted to St. George's is of no moment.... The unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum state....

*Id.* at 542–43 (citations omitted). The *Gehling* court also found it significant that, although St. George's generated income from Pennsylvania, that income was not the result of in-state activities. The court stated:

The income appellees derive from Pennsylvania is not the result of in-state activities; rather, it is the result of the educational services provided by St. George's in Grenada ... [Moreover,] there is no evidence suggesting that students were solicited during the tour [of St. George officials through Pennsylvania] or that the tour was part of a pattern of such visits....

*Id.* at 543.

Finally, with regard to the joint program established by St. George's with the Pennsylvania college, the *Gehling* court refused to find that this program constituted continuous and substantial business activity in Pennsylvania. *Id.* The court stated:

St. George's is an educational institution that provides no educational services in Pennsylvania. Waynesburg is a separate entity that runs its own educational program under the supervision of its own Trustees, Officers and faculty. While one facet of this Pennsylvania-based education-

al program facilitates the admission of foreign students to St. George's Caribbean-based program, nothing in the record suggests that St. George's derives any income from educational services rendered in Pennsylvania.

*Id.*

The holding and reasoning in *Gehling* controls this case. The services rendered by BAPCO—namely, the publication of advertisements in its yellow page directories—occur entirely in nine southeastern states rather than in New Jersey. Moreover, BAPCO neither directly solicits advertisers in New Jersey nor indirectly controls the solicitation of advertisers in New Jersey.

 Absent the rendering of services in New Jersey or the direct solicitation of business in the state, *Gehling* indicates general jurisdiction does not exist over BAPCO in New Jersey merely because (1) an independent and unrelated intermediary facilitates the placement of advertisements in its yellow pages or (2) BAPCO derives income from New Jersey advertisers.[26] As discussed in *Gehling*, the course suggested by Plaintiffs would subject BAPCO to personal jurisdiction, at a minimum, in any state which was the state of incorporation or principal place of business to a CMR which, absent any action by BAPCO, solicited advertising and then contacted BAPCO with advertising for BAPCO's yellow pages. This result is not consistent with due process standards established in *Burger King, Helicopteros* and the other relevant Supreme Court cases. *See supra* at pp. 1207–09.

 Plaintiffs also cite BAPCO's dealings with Bellcore to support the assertion of general *in personam* jurisdiction over BAPCO. This argument too is without merit. All BAPCO has done is purchase a product—namely, a software system and routine updates of that system—from a New Jersey company. Harris Decl., ¶ 3. Although BAPCO may have expended significant monies in the purchase of the LSS System from Bellcore, *see* Opp. Brief at 18, the Supreme Court indicated in *Helicopteros* that such a purchase cannot form the basis for a finding of general jurisdiction. *See* 466 U.S. at 418, 104 S.Ct. at 1874. The *Helicopteros* Court stated:

> We hold that mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of *in personam* jurisdiction over a nonresident corporation in a cause of action unrelated to those purchase transactions.[27]

*Id.; see also Provident Nat'l Bank*, 819 F.2d at 438. This result does not change merely because BAPCO maintains certain employees exclusively to operate the LSS System or because those employees communicate with Bellcore and, on one occasion, visited Bellcore in New Jersey. As the Supreme Court further recognized in *Helicopteros:*

26. This result is supported by other cases in this Circuit. For instance, in *Reliance Steel*, the court determined that no general jurisdiction in Pennsylvania existed over an out-of-state lawyer, merely because (1) the Pennsylvania client was referred to that lawyer by a Pennsylvania resident and (2) the lawyer derived income from the referral. 675 F.2d at 589. As in *Gehling*, the *Reliance* court focussed on the facts that the representation was both unsolicited and did not occur within Pennsylvania. *Id.*

Moreover, in *Provident Nat'l Bank*, the court explained that neither the size of the percentage of an out-of-state corporation's total business represented by its in-state contacts, nor the "absolute amount of dollars and customers" derived from in-state sources, was, standing alone, persuasive proof of substantial continuous and systematic activity. 819 F.2d at 437–38.

Cases cited by Plaintiffs in support of general jurisdiction, *see* Opp. Brief at 37, are either con-

tradictory to its position or are factually distinguishable. *See, e.g., Asahi Metal Indus. Co v. Superior Court of California*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987) (*no* jurisdiction found because defendant did not anticipate sales of its product in forum state); *World–Wide Volkswagen*, 444 U.S. at 297–98, 100 S.Ct. at 567–68 (*no* jurisdiction found because defendant seller of goods did not sell goods in forum state); *Eason*, 706 F.Supp. at 323–24 (jurisdiction found because defendant sold goods and actively solicited sales within forum state); *Gavigan v. Walt Disney World, Inc.*, 646 F.Supp. 786, 788–80 (E.D.Pa.1986) (jurisdiction found because defendant initiated massive promotional campaign specifically directed at forum state).

27. In *Helicopteros*, the amount of goods purchased in the forum state totalled $4 million, nearly the same dollar amount allegedly spent by BAPCO in purchasing and maintaining the LSS System. *See supra* at p. 1205.

Nor can we conclude that the fact that Helicol sent personnel into Texas for training in connection with the purchase of helicopters and equipment in that state in any way enhanced the nature of Helicol's contacts with Texas. The brief presence of Helicol employees in Texas for the purpose of attending the training sessions is no[t a] significant contact.

466 U.S. at 418, 104 S.Ct. at 1874. Accordingly, there is no basis for general jurisdiction based upon BAPCO's contacts and interactions with Bellcore.[28] BAPCO does not maintain a continuous and substantial presence in New Jersey.

### 2. Specific Jurisdiction

Specific jurisdiction, also known as transactional jurisdiction, exists when "the cause of action arises from the defendant's forum-related activities." *North Penn Gas,* 897 F.2d at 690; *see also Provident Nat'l Bank,* 819 F.2d at 437; *Apollo,* 805 F.Supp. at 1182; *Giangola,* 753 F.Supp. at 154; *AT & T,* 736 F.Supp. at 1302. Generally, for a finding of specific personal jurisdiction, the court must examine "the relationship among the defendant, the forum, and the litigation." *Shaffer,* 433 U.S. at 204, 97 S.Ct. at 2580; *see also Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872.

Specific jurisdiction requires not only that the cause of action arise from the defendant's forum-related activities, but also that those forum-related activities rise to the level of minimum contacts with the state, such that the defendant should reasonably anticipate being haled into court there. *North Penn Gas,* 897 F.2d at 690 (citing *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567); *Apollo,* 805 F.Supp. at 1182; *Giangola,* 753 F.Supp. at 154–55. Once it has been decided that minimum contacts exist, the Supreme Court has established that "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial

justice.'" *Burger King,* 471 U.S. at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160); *see also Charles Gendler,* 102 N.J. at 472, 508 A.2d 1127. These factors include: (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 477, 508 A.2d 1127 (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 562); *see also Asahi,* 480 U.S. at 113, 107 S.Ct. at 1032–33; *Charles Gendler,* 102 N.J. at 472, 508 A.2d 1127.

In this case, Plaintiffs seek a declaratory judgment that, (1) Plaintiffs have not infringed on any copyright or other right of BAPCO "by reason of Plaintiffs' preparation and sale of lists containing information taken from the yellow pages in the directories published by BAPCO," (2) Plaintiffs' presentation and sale of their lists constitute a fair use of the information claimed by BAPCO to be copyrighted and (3) BAPCO is barred by estoppel from bringing any copyright action against Plaintiffs. Complaint at 5. In support of the first two contentions, Plaintiffs argue, *inter alia,* that BAPCO does not possess a valid copyright to the information which Plaintiffs extract from BAPCO's yellow pages and include in their lists. Complaint, ¶¶ 19–25.

In cases where, as here, the gravamen is neither a tort, nor an insurance policy, nor any contract at all, the rule regarding specific personal jurisdiction "must necessarily be stricter" than the rule at work in those circumstances and must look to the whole "transaction." *Starline Optical Corp. v. Caldwell,* 598 F.Supp. 1023, 1026 (D.N.J. 1984). In this case, the copyrightability of BAPCO's yellow pages is at issue, meaning that the "transaction" at issue is the production and copyrighting of yellow pages directories in Georgia by BAPCO, a Georgia cor-

---

**28.** Plaintiffs do not allege Burnette's business dealings with BAPCO create a basis for general jurisdiction. Had such an argument been made, it too would have been without merit. BAPCO's limited business dealing with Burnette essentially ended in 1988, when BAPCO ceased publishing the BAPCO Industrial Directory. *See* Hudson Aff., ¶ 6. Accordingly, those past activities cannot provide a current basis for general jurisdiction. *See Eason,* 706 F.Supp. at 323.

poration. The contacts between this "transaction" and the State of New Jersey are nearly non-existent. *See International Communications, Inc. v. Rates Technology, Inc.,* 694 F.Supp. 1347, 1352 (E.D.Wis.1988) (no specific personal jurisdiction when ownership and use of patent not related to forum state); *Starline Optical,* 598 F.Supp. at 1026 (same).

The only forum-related activity of BAPCO which relates to the question of whether Plaintiffs are infringing on its yellow pages copyright is the Cease and Desist Letter sent by BAPCO to Plaintiffs. After first affirming BAPCO's copyright interest in the BAPCO yellow pages, the Cease and Desist Letter states:

> We do not acquiesce in any copying, such as keying or scanning into a computer database, of the compilations of names, addresses, telephone numbers (i.e. listings) and the associated classified headings for said listings found in BAPCO's copyrighted Yellow Pages directories. We must insist that you immediately cease and desist from this type of activity if you are presently doing so. We look forward to receiving an immediate reply to this letter.

Petty Aff., Ex. C.

Courts have consistently held that the sending of a cease and desist letter in patent or copyright cases is alone insufficient to establish the minimum contacts necessary for specific personal jurisdiction. *See Starline Optical,* 598 F.Supp. at 1027 (D.N.J.); *see also E.J. McGowan & Assocs., Inc. v. Biotechnologies, Inc.,* 736 F.Supp. 808, 812 (N.D.Ill.1990); *Gesco,* 17 U.S.P.Q.2d (BNA) at 1171; *Kash 'n Gold, Ltd. v. ATSPI, Inc.,* 690 F.Supp. 1160, 1163 (E.D.N.Y.1988); *Tol-O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft, m.b.H.,* 690 F.Supp. 798, 801 (D.Minn.1987); *Classic Golf Co. v. Karsten Mfg. Co.,* 231 U.S.P.Q. (BNA) 884, 885, 1986 WL 8953 (N.D.Ill.1986) (citing additional cases). As one court explained concerning

a cease and desist letter similar to the one in the case *sub judice:*

> Plaintiffs further urge that by mailing a letter from Texas notifying the New Jersey user-distributor of its alleged infringement, defendant "knowingly chose New Jersey as the forum of the controversy." However, no such conclusion can or should be made. Plaintiffs' contention is speculative because defendant neither filed suit nor even threatened litigation against the New Jersey corporation—in New Jersey or elsewhere. Defendant had not retained New Jersey counsel. Defendant may have equally well presumed to file suit in Texas.... Therefore, plaintiff has not demonstrated that defendant "purposefully avails [him]self of the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws." *Hanson,* 357 U.S. at 252 [78 S.Ct. at 1239] ... or reasonably anticipates being "haled" into court there. *World–Wide [Volkswagen],* 444 U.S. at 297 [100 S.Ct. at 567]; *Shaffer,* 433 U.S. at 216 [97 S.Ct. at 2586].

*Starline Optical,* 598 F.Supp. at 1027 (D.N.J.). Similarly, in the Cease and Desist Letter in this case, BAPCO does not even threaten to sue, let alone to sue in New Jersey.[29] In fact, because the Cease and Desist Letter expressly requests a response from Plaintiffs, the situation may have been resolvable without a lawsuit, despite Plaintiffs' contrary interpretation of the letter. *See* Opp. Brief at 4. Accordingly, the Cease and Desist Letter is, by itself, insufficient to establish either the minimum contacts or purposeful availment necessary for specific personal jurisdiction over BAPCO in New Jersey.[30] *Tol–O–matic,* 690 F.Supp. at 801; *Starline Optical,* 598 F.Supp. at 1026–27.

■ Although Plaintiffs concede that the Cease and Desist Letter is insufficient to establish specific personal jurisdiction, *see* Opp. Brief at 32 n. 8, Plaintiffs argue the

---

**29.** In fact, given that BAPCO is currently involved in three identical suits in Georgia, *see supra* n. 23, it is likely that any suit would have been filed in Georgia.

**30.** As courts have pointed out, there are a number of important policies served by this rule. First, "were the dispatch of notice-of-infringement letters to operate as a waiver of objection to

*in personam* jurisdiction, the result would be a chilling effect on assertion of legal rights by holders of copyrights, patents, and trademarks." *Starline Optical,* 598 F.Supp. at 1027; *Classic Golf,* 231 U.S.P.Q. (BNA) at 885–86, 1986 WL 8953. Second, because "one may also regard such letters as attempting to produce out-of-court solutions," *Starline Optical,* 598 F.Supp. at 1027, the interest of the parties and the court in settling such disputes without litigation is served by

Cease and Desist letter in conjunction with BAPCO's "purposeful ... related, substantial contacts with New Jersey [CMRs]" is sufficient to confer specific personal jurisdiction. *Id.* at 30–32. This argument is meritless. BAPCO's contacts with the New Jersey CMRs have no relation to this declaratory judgment action. The predominant issues in this litigation are (1) whether BAPCO can and did copyright the information in its yellow pages directories and (2) whether Plaintiffs infringed on that copyright by compiling their database lists. The fact that BAPCO receives national advertisements through New Jersey CMRs in no way relates to or impacts on these issues.[31] *See Gesco,* 17 U.S.P.Q.2d (BNA) at 1171–72; *Starline Optical,* 598 F.Supp. at 1026. This being the case, Plaintiffs cannot rely on these contacts to confer specific personal jurisdiction on BAPCO.[32]

■■■■■ Plaintiffs appear to be arguing that a cease-and-desist letter, combined with some substantial quantum of other, unrelated contacts with New Jersey, is sufficient to confer personal jurisdiction over BAPCO. *See, e.g.,* Opp. Brief at 32–36 & n. 8. If this

is Plaintiffs argument, it too is rejected because such an argument confuses the mandated distinction between specific and general personal jurisdiction. *See Burger King,* 471 U.S. at 472–73 & n. 15, 105 S.Ct. at 2181–83 & n. 15; *Helicopteros,* 466 U.S. at 414, 104 S.Ct. at 1872; *Reliance Steel,* 675 F.2d at 588 (3d Cir.); *Millipore,* 682 F.Supp. at 235. To establish the specific jurisdiction, contacts with the proposed forum must not only meet or exceed constitutionally minimum contacts, they must also be *related* to the cause of action. *Reliance Steel,* 675 F.2d at 588. In other words, regardless of how substantial a defendant's contacts are with the forum state, those contacts cannot confer specific personal jurisdiction if they are not related to the cause of action. *Id.* Because it has been determined that (1) BAPCO's contacts with New Jersey CMRs are not related to the cause of action in this case[33] and (2) those same contacts are not continuous or substantial enough to establish general personal jurisdiction, *see supra* at pp. 1209–12, BAPCO is not subject to personal jurisdiction in New Jersey for the purposes of this case. Accordingly, Plaintiffs have failed to

the rule. *Id.; Classic Golf,* 231 U.S.P.Q. (BNA) at 885–86. As some courts have stated, to allow jurisdiction based solely on the mailing of cease and desist letters "would result in 'blitzkrieg' litigation, where suits would be filed without prior warning or attempt to settle suits in order to avoid foreign jurisdiction." *E.J. McGowan,* 736 F.Supp. at 812 n. 7; *see also Nova Biomedical Corp. v. Moller,* 629 F.2d 190, 196 (1st Cir. 1980).

31. Plaintiffs argue:
Plaintiffs' cause of action asks for a declaration that its preparation and use of computer databases ... does not infringe [BAPCO]'s copyrights. The information entered into plaintiffs' databases comprises information about yellow pages listings and advertisements which were solicited for [BAPCO]'s yellow pages by New Jersey [CMRs].... Under these circumstances, there can be no doubt that the cause of action for declaratory judgment of noninfringement relates *directly* and *specifically* to [BAPCO]'s activities with the State of New Jersey.
Opp. Brief at 29 (emphasis in original).
This argument misses the point. The existence of New Jersey CMRs or even New Jersey-based advertisers is irrelevant. The CMRs have nothing to do with the selection, arrangement or coordination of the listings in BAPCO's yellow pages and, hence, have nothing to do with their copyrightability. Even if no advertisements or

listings could be tied to New Jersey, Plaintiffs could still infringe on BAPCO's copyright by compiling lists from BAPCO's yellow pages. Moreover, there is no allegation by Plaintiffs that the information used to compile its lists is derived solely from ads and listings procured by New Jersey CMRs. Plaintiffs presumably use information from BAPCO's yellow pages regardless of how it is procured or from where it originates. In fact, it is difficult to understand how Plaintiffs would be privy to such source information simply by looking at and copying BAPCO's yellow pages. In short, there is no link between BAPCO's use of CMRs in New Jersey and the activity of Plaintiffs in compiling their lists. The cause of action in this case neither relates to nor arises from BAPCO's contacts with New Jersey CMRs.

32. Because Plaintiffs has failed to establish minimum contacts sufficient to subject BAPCO to specific personal jurisdiction in New Jersey, the second portion of the personal jurisdiction analysis—namely, whether it would be fair and just to subject BAPCO to personal jurisdiction in New Jersey, *see supra* at p. 1212—need not be considered. *Millipore,* 682 F.Supp. at 235.

33. Plaintiffs do not argue that Burnette's own business dealings with BAPCO establish specific personal jurisdiction over BAPCO. Such an argument would be unavailing as BAPCO has not

establish that venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2).

C. *Venue Pursuant to 28 U.S.C. § 1391(b)(2): Place Where Substantial Part of Events or Omissions Giving Rise to Claim Occurred*

Plaintiffs argue venue is proper in New Jersey under 28 U.S.C. § 1391(b)(2) because this is the place where a substantial part of the events giving rise to the cause of action occurred. Opp. Brief at 25–26. Then, without citation to any authority, Plaintiffs argue that "[i]f venue is proper under *either* Section 1391(b)(2) or Section 1391(b)(1), the court must deny [BAPCO's] motion to transfer under Section 1406(a)." *Id.* at 25 (emphasis in original). Plaintiffs further assert:

> Because [BAPCO] has the burden of proving lack of venue, [and] because it has failed to address the correctness of venue in this district under Section 1391(b)(2), and because [P]laintiffs have affirmatively shown that venue is correct in this district under Section 1391(b)(2), the court must hold that [BAPCO] has failed to prove lack of venue. The court must therefore deny [BAPCO]'s motion to dismiss for lack of venue under 28 U.S.C. § 1406(a).

*Id.* at 26.

Even if venue were technically proper in this district under 28 U.S.C.

purchased mailing lists from Burnette since 1988, when it ceased publishing the BAPCO Industrial Directory. Hudson Aff., ¶ 6; *see also Eason*, 706 F.Supp. at 323 (past actions cannot confer current personal jurisdiction). Moreover, because the BAPCO Industrial Directory was unrelated to BAPCO's yellow pages, meaning that BAPCO's dealings with Burnette did not concern the copyrightability of BAPCO's yellow pages, those dealings are unrelated to the claims raised in this case.

**34.** This case presents a somewhat anomalous situation. On the one hand, as discussed above, sending of a cease and desist letter is insufficient to establish minimum contacts necessary for the assertion of specific personal jurisdiction. *See supra* at pp. 1212–13. On the other hand, some courts have held that venue is proper in a district merely because a cease and desist letter is received there. *See Millipore*, 682 F.Supp. at 234; *Pennwalt*, 582 F.Supp. at 440.

§ 1391(b)(2), this court lacks personal jurisdiction over BAPCO.[34] This being the case, a finding of proper venue under Section 1391(b)(2) is irrelevant. BAPCO can neither be compelled to defend this action in New Jersey nor is it subject to the jurisdiction of this court.

Accordingly, faced with the choice of dismissing this action for lack of personal jurisdiction or transferring the case to Georgia, "interests of justice" dictate that transfer is appropriate pursuant to 28 U.S.C. § 1406(a).[35] As the Supreme Court noted in *Goldlawr*, Section 1406(a) exists to "remov[e] whatever obstacles may impede an expeditious [and] orderly adjudication of cases on their merits." 369 U.S. at 466–67, 82 S.Ct. at 916; *accord IUE AFL–CIO Pension Fund, etc. v. Locke Machine Co.*, 726 F.Supp. 561, 572 (D.N.J.1989) (same). Thus, in the absence of personal jurisdiction over BAPCO in New Jersey, this action will be and is transferred to the Northern District of Georgia.[36]

*Conclusion*

The motion of BAPCO for transfer to the Northern District of Georgia is granted pursuant to 28 U.S.C. § 1406(a).

**35.** Both venue and personal jurisdiction are proper in the Northern District of Georgia because BAPCO has its principal place of business and is subject to personal jurisdiction there. *See* 28 U.S.C. § 1391(b)(1) & (c).

**36.** Plaintiffs suggest that, because BAPCO has filed a motion to transfer under 28 U.S.C. § 1406 rather than a motion to dismiss for lack of personal jurisdiction, BAPCO has not correctly challenged the assertion of personal jurisdiction in New Jersey. *See* Opp. Brief at 25 n. 2. This argument is specious. Moreover, even if it were true, BAPCO preserved the defense of lack of personal jurisdiction in its answer, *see* Answer, filed 21 Oct. 1992, at 5–6. Accordingly, under Fed.R.Civ. 12(h)(1), BAPCO has not waived this defense and could bring a follow-up motion to dismiss for lack of personal jurisdiction. Such a course is (1) unnecessary, (2) would waste the resources of both this court and of the parties and (3) is exactly the situation sought to be avoided by 28 U.S.C. § 1406(a). *See Goldlawr*, 369 U.S. at 466, 82 S.Ct. at 915–16.